UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHICAGO TITLE
INSURANCE CORPORATION,

        Plaintiff,                       Case No. 2:03-cv-368
                                      JUDGE GREGORY L. FROST
   v.                            Magistrate Judge Mark R. Abel

JAMES A. MAGNUSON, et al.,

        Defendants.

**OPINION AND ORDER**

This matter is before the Court for consideration of the following sets of filings:

(1) a motion for judgment as a matter of law or a new trial, or, in the alternative, motion

for remittur based upon punitive damages issues (Doc. # 192) filed by Defendant First American

Title Insurance Company ("First American"); a memorandum in support of that motion (Doc. #

206); a memorandum in opposition (Doc. # 215) filed by Chicago Title Insurance Corporation

("Chicago Title"); and a reply memorandum (Doc. # 220) filed by First American;

(2) a motion for judgment as a matter of law or a new trial based upon causation and

compensatory damages issues (Doc. # 193) filed by First American; a memorandum in support

of that motion (Doc. # 207); a memorandum in opposition (Doc. # 216) filed by Chicago Title;

and a reply memorandum (Doc. # 219) filed by First American;

(3) a motion for judgment as a matter of law or a new trial (Doc. # 194) filed by

Defendant James Magnuson; a memorandum in support of that motion (Doc. # 208); a

memorandum in opposition (Doc. # 214) filed by Chicago Title; and a reply memorandum (Doc.

1

# 224) filed by Magnuson;

(4) a motion for entry of permanent injunction (Doc. # 196) and supporting memorandum
(Doc. # 197) filed by Chicago Title; a memorandum in opposition (Doc. # 213) filed by First
American; and a reply memorandum (Doc. # 222) filed by Chicago Title; and

(5) a motion for determination and entry of award of attorneys' fees and costs (Doc. #
198) filed by Chicago Title; a memorandum in opposition (Doc. # 212) filed by First American;
and a reply memorandum (Doc. # 223) filed by Chicago Title.

## I. Background

In 1978, Magnuson and a business partner, James Steller, formed a title insurance agency
known as Northern Title Insurance Agency (later known as Chicago Title Agency of Central
Ohio, Incorporated). In July 1991, Magnuson, Steller, and four other business partners later
added as shareholders sold their interests in their company to the legal predecessor of Chicago
Title, which is a national title insurance underwriter that does business in Ohio. As part of this
sale, the parties entered into a 1991 purchase agreement that required the sellers, including
Magnuson, to enter into employment contracts with Chicago Title that would contain non-
competition clauses. (Doc. # 21, Ex, A, Purchase Agreement, at 6 § 10.) Magnuson's
employment contract therefore contained a section entitled "Competitive Employment," which
provided in relevant part:

> For a period of five years after the term of this Agreement, [Magnuson] shall not,
> except with prior written consent of [Chicago Title], directly or indirectly, engage
> in any business, including that of a title insurance agency ... whether as owner,
> director, officer, investor, employee or otherwise, which is in competition with
> the business of [Chicago Title] or any affiliates of [Chicago Title] in the Counties
> of Franklin, Union, Madison, Delaware, Licking, Fairfield and Pickaway, in the

2

> State of Ohio.  Any breach of this covenant shall be sufficient to permit [Chicago
> Title] to terminate this Contract for cause and also, at its option to be entitled to
> injunctive relief against [Magnuson] in a court of appropriate jurisdiction
> enforcing this restriction.

(Ex. P-4, Employment Contract, at 3.)  Absent early termination for inapplicable reasons

specified in the contract, Magnuson's employment was originally set to terminate on June 30,

1996.  (Doc. # 21, Ex, A, Employment Contract, at 1.)  Magnuson and Chicago Title

subsequently amended the employment contract in June 1993, however, extending its duration

until December 31, 2001.  (Doc. # 21, Ex. A, First Amendment to Employment Contract, at 1.)

The amendment did not expressly modify the non-compete clause and provided that "[e]xcept as

expressly modified herein, all other terms and provisions of the said Employment Contract shall

remain in effect and unchanged."  (Doc. # 21, Ex. A, First Amendment to Employment Contract,

at 2.)

Magnuson continued to work in various capacities for Chicago Title, Fidelity, Security

Union, and Ticor until his resignation on December 2, 2002.  He then began to work as an

employee and officer of Talon Title–also known as The Talon Group–which is a division of First

American, a title insurer that competes with Chicago Title in Ohio and elsewhere.  The

negotiations between Magnuson and First American initially contemplated that Magnuson would

be in charge of Talon's Ohio and Indiana operations.  After Magnuson disclosed his non-

competition covenant with Chicago Title, however, Magnuson and Talon included the following

provision in his Talon/First American employment agreement:

> [Magnuson] has informed [Talon] that in connection with the sale of a prior
> business there was a covenant not to compete that covered certain counties in the
> Columbus, Ohio metropolitan area.  In no event do either of the parties hereto
> want or intend [Magnuson] to violate this covenant not to compete.  Therefore,

3

> subject to the terms and conditions of this Agreement, [Talon] employs [Magnuson] to serve in an executive and managerial capacity as Vice President managing the states of Indiana and Ohio (except the Columbus metropolitan area) as well as a [*sic*] providing assistance in other areas especially the state of Florida.

(Doc. # 52, Ex. 7, Employment Agreement, at 1 § 1.)  An additional provision indemnified

Magnuson against

> an action brought by a third party ... to impose liability or penalty ... for an act alleged to have been committed by [Magnuson] while [Magnuson] was employed by and acting in good faith on behalf of [Talon], within the scope of his job responsibilities and for a purpose which [Magnuson] reasonably believed to be in the best interests of [Talon or its shareholders].

(Doc. # 52, Ex. 7, Employment Agreement, at 4 § 12.)  In addition to assisting in Talon's

development of Ohio business, Chicago Title asserts, Magnuson has also been involved in the

successful recruitment of thirty-two individuals from Chicago Title to work for Talon.

On April 24, 2003, Chicago Title initiated this action (Doc. # 1), later amending its

Complaint to assert only the following three claims: breach of contract against Magnuson,

seeking damages and enforcement of the non-competition agreement; tortious interference with

contractual relations against First American/Talon, for purportedly interfering with the

Magnuson-Chicago Title non-competition agreement; and tortious interference with business

relations against Talon and Magnuson, for hiring employees away from Chicago Title to Talon.

Magnuson in turn asserted a counterclaim against Chicago Title and a third-party complaint

against Ticor and Fidelity for their refusal to pay him a 2002 bonus and incentive compensation,

as well as for breach of the 1991 employment agreement and the 1993 amendment.  (Doc. # 91,

at 8 ¶¶ 1-4.)

All the parties moved for summary judgment.  In an August 25, 2005 Opinion and Order

4

(Doc. # 98), the Court granted summary judgment on liability only in favor of Chicago Title on several aspects of the case, but found that genuine issues of material fact precluded entry of summary judgment on other remaining aspects of the case.  The matter proceeded to a jury trial on January 3, 2005.  On January 25, 2005, the jury returned a verdict in favor of Chicago Title and against First American and Magnuson in the amount of $10.8 million in compensatory damages and $32.4 million in punitive damages.  (Doc. # 185.)

Following entry of judgment (Docs. # 187, 188), First American filed two motions for judgment as a matter of law or a new trial (Docs. # 192, 193), Magnuson filed one motion for judgment as a matter of law or a new trial (Doc. # 194), and Chicago Title filed a motion for entry of a permanent injunction (Doc. # 196) and a motion for attorneys' fees and costs (Doc. # 198).  The parties have exhaustively briefed the issues involved, and these motions are now ripe for adjudication.

## II.  Defendants' Motions

### A.  Standards Involved

Defendants' motions join two types of requests: a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and a motion for a new trial under Rule 59.  The Sixth Circuit has explained that "[a] judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) may only be granted where, in viewing the evidence in the light most favorable to the non-moving party, no genuine issue of material fact remains for the jury, and all reasonable minds would necessarily find in favor of the moving party."  *Bach v. First Union Nat'l Bank*, No. 04-3899, 2005 WL 2009272, at *5 (6th Cir. 2005) (citing *Gray v. Toshiba Am. Consumer Prods., Inc.,* 263 F.3d 595, 598 (6th Cir.2001)).  In conducting this inquiry, a court

cannot weigh the evidence, evaluate the credibility of the witnesses, or substitute its judgment for the jury verdict. *Id*. at *5 (quoting *Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150, 1152 (6th Cir. 1995)).

A court can grant a new trial under Rule 59 "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a)(1). Thus, a new trial is warranted "where the jury has reached a seriously erroneous result, as evidenced by (1) the verdict being against the weight of the evidence, (2) the damages being excessive, or (3) the trial being unfair to the moving party in some fashion." *Medlin v. Clyde Sparks Wrecker Serv., Inc.*, 59 Fed. Appx. 770, 776 (6th Cir. 2003) (citing *Holmes v. City of Massillon,* 78 F.3d 1041, 1045-46 (6th Cir.1996)).

### B.  First American's Motion on Punitive Damages Issues (Doc. # 192)

First American predicates its motion for judgment as a matter of law or for a new trial on three basic grounds.  None of these grounds are well taken.

### 1.  Evidence of Malice

The company first argues that Chicago Title failed to prove malice as required under Ohio law.  Proving malice is indeed a prerequisite for recovering punitive damages, because

> Ohio law provides that an award of punitive damages is available only upon a finding of actual malice.  *Berge v. Columbus Community Cable Access* (1999), 136 Ohio App.3d 281, 316, 736 N.E.2d 517.  The "actual malice" necessary for purposes of an award of punitive damages has been defined as " '(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.' " *Id.*, quoting *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus.

*Kemp v. Kemp*, 161 Ohio App. 3d 671, 681, 831 N.E.2d 1038, 1045 (Ohio App. 5th  Dist. 2005).
*See also Calmes v. Goodyear Tire & Rubber Co., Inc.*, 61 Ohio St. 3d 470, 473, 575 N.E.2d 416,
419 (1991).

First American's argument is premised in part on the remarkable assumption that the jury
believed its evidence that the company proceeded "in a cautious and good faith manner" in
employing Magnuson and that it "was taking reasonable precautions to *protect* Chicago Title's
interests, not disregard them."  (Doc. # 206, at 7, 8.)  But such a circular, self-serving contention
ignores that the incredulous jury was free to disbelieve the often impeached testimony of First
American's witnesses.  The jury was free to conclude that First American did not in fact make
any attempt whatsoever to follow the course of conduct in which the company claims to have
engaged.  In other words, just because First American said it did something or offered an
innocent explanation for what it did does not mean that the jury was required to believe that such
proper conduct occurred or that the company did not act with malicious intent.  The jury was free
to evaluate the credibility of the witnesses, weigh the evidence (including reasonable inferences),
and draw its own conclusions as to First American's conduct and intent.

Equally dubious is First American's alternate premise that it was punished for seeking
greater marker share within its industry or for engaging in "industry-appropriate" recruiting
practices that are the norm in its industry.  Again, First American's loaded premise begs the
answer, but the company again errs in framing the issue.  Chicago Title did not argue that malice
existed based on mere competition, but instead asserted that First American's competing by
*improper* means reflected malice.  Further, there was little evidence supporting First American's
"industry norm" argument, and even if there were, even industry-wide impropriety does not

7

excuse the specific misconduct involved here.  It is axiomatic that a party cannot excuse its tortious conduct by pointing to the alleged tortious conduct of its peers.  It is also axiomatic that the jury was free to determine whether the impropriety involved here indicated malice or simple unfair business practices.  The jury obviously found that malice existed.

Similarly unpersuasive is First American's reasoning that no malice could be found in the compensation scheme the company set for Magnuson.  Just as First American errs in continuing to regard the indemnity agreement as impermissible evidence, the company also errs in arguing that because Magnuson never *actually* received any bonus or stock related to Ohio profits, he could not have been motivated by the *possibility* of receiving such additional compensation.  This is an illogical inference that the jury was free to reject, just as the jury was free to reject the company's explanation that the compensation scheme was the product of mere oversight.

Also unconvincing is First American's argument that Chicago Title misled the jury into finding malice based on the fact that First American defended itself at trial.  In making this argument, First American either unintentionally misconstrues or purposefully mischaracterizes much of the substance of Chicago Title's closing.

The Court agrees with First American that counsel for Chicago Title pointed to the fact that First American earns approximately $2.0 million in net profit per day, noted that the trial took approximately fifteen days, and asked for a minimum of $2.0 million in punitive damages for each of those days.  But these closing remarks targeted the amount of punitive damages Chicago Title sought, not the factual predicate for awarding those damages.  (The Court also recognizes that the jury apparently simply evaluated the compensatory damages involved in this case–presumably in light of First American's $2.0 million a day in net profits–and tripled the

compensatory damages award to arrive at its punitive damages award.)  This does not equate to punishing a party for exercising its right to litigate its interests, and there is no actual evidence here that the jury did such a thing in this case.  Further, despite First American's strategic labeling of Chicago Title's closing as "a thinly-veiled attack on the Court" for having let the matter proceed to trial (Doc. # 206, at 11), the Court itself finds no basis here for granting the paternalistic First American's joint motion.

In its memorandum in opposition, Chicago Title has exhaustively and correctly set forth the predicate evidentiary chain that can support the jury's punitive damages award.  The Court need not repeat that evidence here in more detail than the above references.  But the Court must note that viewing all the evidence in a light most favorable to the non-moving Chicago Title, the Court cannot say that First American is entitled to judgment as a matter of law.  Further, given the jury's ability to wholly disregard the testimony of First American's witnesses, the Court also cannot say that the jury's verdict was against the weight of the evidence so as to warrant a new trial.

### 2. *Jury Instructions and Interrogatories*

As a second ground for invalidating the jury's punitive damages award, First American contends that there were errors in the instructions and interrogatories submitted to the jury. Specifically, the company asserts that the instructions did not include the proper standard for awarding punitive damages and that the interrogatories failed to provide for separate assessment of the contract and tort damages to sustain a compensatory or punitive damages award.

Chicago Title initially responds to both allegations by pointing out that because First American failed to object to the pertinent instructions and interrogatories, the company lost the

9

right to assert error now.  Chicago Title correctly directs this Court to Federal Rule of Civil

Procedure 51, which requires an objection on the record to "an instruction or the failure to give

an instruction."  Fed. R. Civ. P. 51(c)(1).  The consequent waiver that a failure to object

produces also extends to the failure to object to jury interrogatories.   *Johnson v. Howard*, 24

Fed. Appx. 480, 485 (6th Cir. 2001).

First American in turn directs this Court to case law indicating that the mere request for

an instruction preserves the issue.  What First American does not discuss, however, is that after

much discussion at the charging conference, its trial counsel expressly elected to pursue only

select objections.  These five objections, set forth at pages 3203 to 3205 of the trial transcript,

simply do not include the punitive damages issues First American now asserts, and defense

counsel expressly stated that he had no further objections than these five when later given

another opportunity to object.  (Tr. at 3423-24.)  Accordingly, in light of the fact that trial

counsel either had apparently elected to abandon the issues *sub judice* or had determined that

their arguments were substantively deficient, the Court concludes that First American forfeited

or abandoned its allegations of the purported errors in the instructions and interrogatories and

can now only assert its arguments as plain error.

Even assuming *arguendo* that First American did not forfeit its arguments, the Court

finds these arguments substantively wanting.  First American complains that the Court delivered

an incomplete instruction to the jury by failing to tell the jury that Chicago Title had to adduce

proof of actual damages that resulted from its malicious or fraudulent acts or omissions.  But the

Court instructed the jury as follows:

Chicago Title also brought suit against First American claiming that First

10

American knew about the terms of the noncompetition provision of the contract that Mr. Magnuson had with Chicago Title and interfered with the contract by inducing Mr. Magnuson to breach his contract with Chicago Title.  The Court already found that First American did interfere with the employment contract between Mr. Magnuson and Chicago Title by inducing Mr. Magnuson to breach it.  Therefore, as to First American, the question for you to decide – questions for you to decide are whether Chicago Title proved by a preponderance of the evidence that First American proximately caused Chicago Title to suffer compensatory damages, and if so, how much.  If you find that Chicago Title is entitled to compensatory damages, you will decide whether Chicago Title has proved by clear and convincing evidence that it is entitled to punitive damages.

(Tr. at 3401-02.)  The Court also instructed the jury a few moments later:

[Y]ou must decide whether Chicago Title proved by a preponderance of the evidence that First American proximately caused compensatory damages to Chicago Title.  If you find that First American proximately caused these damages to Chicago Title, then you must decide what amount of compensatory damages, if any, that Chicago Title proved by a preponderance of the evidence should be awarded.

The compensatory damages claim by Chicago Title for Mr. Magnuson's breach of contract and for First American's intentional interference with contractual relations are the same.  Chicago Title claims that its compensatory damages for both claims include, among other items of damage, the lost profits from customers that moved.  If you find that Chicago Title proved by a preponderance of the evidence that it suffered compensatory damages proximately caused by First American, then you must further decide whether Chicago Title proved by clear and convincing evidence that First American is liable for punitive damages, and if so, in what amount.

(Tr. at 3403-04.)  And the Court later repeated this point, explaining:

The compensatory damages available to Chicago Title in its claim against First American are the same as are available on the claim against Mr. Magnuson.  If you find for Chicago Title and award compensatory damages on its claim against First American, you will proceed further to decide whether you will separately award punitive damages against First American.  If you do not find compensatory damages, you cannot consider punitive damages.

You will decide whether First American shall be liable for punitive damages in addition to any compensatory damages that you award to Chicago Title for interference for contractual relations.  The purpose of punitive damages

11

> is to punish the offending party and to make the offending party an example to discourage others from similar conduct.  You may decide that First American is liable for punitive damages if you find by clear and convincing evidence that First American's acts or failures to act demonstrated malice, aggravated or egregious fraud, oppression, or insult.

(Tr. at 3408.)  These instructions told the jury that it could not award punitive damages without first awarding compensatory damages on the tort claim against First American.  The instructions also explained that the jury could not award punitive damages without finding by clear and convincing evidence that First American's acts or failures to act demonstrated malice, aggravated or egregious fraud, oppression, or insult.  This satisfies the substance of the model instruction First American references because it predicates the award of punitive damages on malicious acts or omissions that produced tort-related compensatory damages; the instruction does not enable the jury to consider *other* malicious acts, even if stray comments by Chicago Title's counsel referenced other acts.  The jury therefore was informed that the essence of Chicago Title's case was that the out-of-the-ordinary, improper, and malicious conduct caused compensatory damages and that only acts causing these damages–not trial conduct–could provide a basis for punitive damages.  The Court agrees with Chicago Title that to the extent First American argues otherwise, First American mischaracterizes the litigation.

The Court emphasized in its instructions that any compensatory damages arising from the tort were necessarily the same as any compensatory damages arising from the breach of contract. The latter flowed from the former, and as cited above, the Court emphasized that *only* compensatory damages for the tort could lead to punitive damages.  (Tr. at 3408 ("If you find for Chicago Title and award compensatory damages on its claim against First American, you will proceed further to decide whether you will separately award punitive damages against First

12

American.  If you do not find compensatory damages, you cannot consider punitive damages.").)

Moreover, Interrogatory No. 3 targeted the total amount of compensatory damages, and given

the evidence produced and the amount the jury awarded, any suggestion that the jury doubled the

compensatory damages is uncertain, speculative, and unwarranted. *Johnson*, 24 Fed. Appx. at

486.  Interrogatory No. 4 in turn asked the jurors to answer whether any of the compensatory

damages indicated in Interrogatory No. 3 were proximately caused by First American.  Because

the Court repeatedly told the jury that the compensatory damages available in the contract claim

were the *same* as in the tort claim, the fourth interrogatory functioned to test whether the

compensatory damages awarded against First American could enable punitive damages.  This

was a scheme with wording upon which *all parties agreed* (Tr. at 3201)–after much discussion

and suggestions by the Court and counsel during the charging conference–and to which no party

objected (Tr. at 3422).  The Court is frankly surprised that First American would now argue

otherwise, despite the presence of new counsel.  Presumptively, new counsel has reviewed what

occurred at the charging conference with First American's trial counsel (who still represent

Magnuson) and should be aware of the fact that all parties accepted the interrogatories, which

were ultimately the product of discussions with counsel.  Thus, even if the interrogatories were

in error, the concept of invited error applies here.

Moreover, again assuming *arguendo* that the instructions or interrogatories were

confusing, the evidence presented and counsel's own explanations to the jury of what punitive

damages were possible preclude any prejudice to First American.  *See Coggins v. KLLM, Inc.*,

Nos. 04-5131 & 04-5135, 2005 WL 1869512, at *2 (6th Cir. Aug. 1, 2005) (citing the evidence

presented and counsel's closing remarks as clarifying verdict forms for the jury so as to preclude

13

prejudice).  The interrogatory responses and damages awarded reconcile with the evidence

presented at trial; Chicago Title claimed approximately $13 million in compensatory damages

and the jury awarded approximately $10 million in compensatory damages. Further, Chicago

Title's counsel explained to the jury:

> The focus is not on what Jim Magnuson did in consciously disregarding anything.
> [Chicago Title] is not asking for punitive damages against Jim Magnuson, we
> can't get punitive damages against Jim Magnuson.  The tort claim, the intentional
> inducement, is against First American Title Insurance Company.

(Tr. at 3385-86.)  Such comments target the core punitive damages issue: that such damages

were tied only to the tort compensatory damages and the tort was against only First American.

The end result is that the jury was fully informed that (1) any compensatory damages resulting

from Magnuson's contractual breach flowed from First American's tortious inducement of that

breach, (2) there could be no different compensatory damages for the tort than there could be for

the breach of contract, and (3) the compensatory damages resulting from the tort were the only

damages that were of import to the punitive damages issue.  First American's arguments to the

contrary are unpersuasive.

### 3.  *Federal Due Process and State Limitations on Damages*

First American argues that the punitive damages award at issue in this case violates the

Due Process Clause of the United States Constitution and Section 16, Article I of the Ohio

Constitution, as well as state court precedent.  The company also asserts that the punitive

damages award is against the weight of the evidence and is the product of a jury infected by

passion and prejudice.  Alternatively, First American seeks a remittitur of the award.

The key issue here is whether the jury's punitive damages award, which is presumptively

14

valid, was grossly excessive. The Sixth Circuit has explained the necessary analysis:

> The Supreme Court's approach to reviewing the constitutionality of a punitive damage award is laid out in the [case of *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408 (2003)]. In *State Farm,* the Supreme Court noted that punitive awards, designed as tools of deterrence and retribution, have upward limits imposed by the elementary notions of fairness contained in the Due Process Clause. 538 U.S. at 416-17. The Supreme Court laid out three guideposts for courts to consider in reviewing the constitutionality of punitive damage awards: (1) the reprehensibility of the defendant's conduct; (2) the disparity between the actual harm suffered by the plaintiff and the size of the punitive damage award; and (3) the difference between the punitive damages awarded and the civil or criminal penalties imposed or authorized for comparable misconduct. *Id.* at 418.

*Bach*, 2005 WL 2009272, at *8. This Court shall therefore address each guidepost or factor in turn.

In regard to the first guidepost, the Court initially concludes that the reprehensibility of Defendants' conduct supports the punitive damages awarded. In reaching this conclusion, the Court is guided by the relevant indicators of reprehensibility that govern such an inquiry:

> (1) whether the harm caused was physical or economic; (2) whether the conduct showed an indifference or reckless disregard for the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was merely the result of an isolated instance; and (5) whether the harm was caused by intentional malice, trickery or deceit or was rather accidental.

*Bach*, 2005 WL 2009272, at *9 (*State Farm*, 538 U.S. at 419). Here, the harm involved was undeniably solely economic, which leads to two conclusions. First, as Chicago Title notes, the United States Supreme Court has recognized that "[the] infliction of economic injury, especially when done intentionally through affirmative acts of misconduct ... or when the target is financially vulnerable, can warrant a substantial penalty." *BMW of North America, Inc. v. Gore*,

15

517 U.S. 559, 576 (1996) (citation omitted). Although "this observation does not convert all acts that cause economic harm into torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages,"*id.*, it also does not mean that substantial punitive damages are not wholly appropriate for only economic damages. Second, "because [Defendants'] actions occurred in the 'economic realm,' it cannot be said that the tortious conduct displayed an indifference or reckless disregard for the health and safety of others. Therefore, the second indicator of reprehensibility is not met." *Id*.

The third factor, whether Chicago Title was financially vulnerable, is less clear cut. The larger Chicago Title company certainly possessed a more substantial ability to absorb the damage caused by Defendants than its subdivisions viewed separately. Also less than dispositive is the fact that although Defendants's conduct involved repeated actions spread out over a notable period of time, the jury was not permitted to consider evidence of a nationwide pattern of allegedly tortious conduct, such as the Arizona case. *See Bach*, 2005 WL 2009272, at *9 (explaining that *State Farm* apparently requires inquiring whether misconduct replicates prior transgressions). In this case, then, although the Court was informed of numerous other instances of similar conduct nationwide–about which the Court expresses no opinion as to whether they create liability–the jury only considered that there was not one infraction but multiple infractions involved in Defendants' business plan to profit from their misconduct *here*. Finally, the harm inflicted by Defendants was not accidental but was caused by intentional malice, trickery or deceit. Defendants' misconduct formed the foundation of their business plan and can in no way be regarded as mere accident. The jury in fact specifically found that Defendants' misconduct evinced malice, and the fact that Chicago Title placed First American's wealth before the jury to

16

inform the amount of damages does not mean that the jury relied upon such information to determine whether any such damages were justified. First American's contrary proposition is unfounded speculation that finds no more support in the record than does its assertion that Chicago Title impermissibly used it's opponents' out-of-state status to justify punitive damages.

The Court thus concludes that Chicago Title's Ohio operation presented a financially vulnerable victim subject to malicious acts of trickery and deceit. At least two of the reprehensibility factors therefore exist, distinguishing this case from the one-factor *Bach* and providing some support for a finding of reprehensibility.

The second guidepost to be addressed is the disparity between the harm Chicago Title suffered and the size of the punitive damages awarded. This inquiry requires that the Court examine the ratio between the amount of actual or compensatory damages that Chicago Title suffered and the punitive damages awarded. *Id*. at *10. The damages ratio here is precisely 3:1–$32.4 million punitive damages in relation to $10.8 million compensatory damages.

There is no bright-line rule for when a punitive damages award is unconstitutional, although the Supreme Court has explained that "awards exceeding a single-digit ratio will rarely be upheld against a constitutional challenge" with "a four-to-one ratio ... 'close to the line of constitutional impropriety.' " *Id*. (quoting *State Farm*, 538 U.S. at 424-25). Further, "where the amount of compensatory damages is high, a lesser amount of punitive damages, perhaps only in an amount equal to the compensatory damages, may comport with due process." *Id*. (citing *State Farm*, 538 U.S. at 425).

First American argues that *State Farm* and its progeny indicate that when only economic damages are involved, at best a 1:1 ratio of punitive to compensatory damages comports with

due process.  The company cites to a number of cases presented to support this general

proposition.  But these cases do not carry the day here, because they are distinguishable insofar

as the case *sub judice* involves a particularly egregious act.  No binding precedent imposes a

limit of a ratio of 1:1, and for the Court to impose one here would be to abuse its discretion by

invading the province of the jury.  The facts and circumstances of this case and the gravity of the

harm to Chicago Title support upholding the punitive damages award.  *State Farm*, 538 U.S. at

415.  The United States Supreme Court recognized that well over five hundred years of

jurisprudence support "sanctions of double, treble, or quadruple damages to deter and punish."

*Id*.  This Court should not and will not ignore that principle here, just as numerous other courts to

which Chicago Title cites have not ignored that principle.  *See* Doc. # 215, at 27 (collecting cases

upholding punitive damages awards exceeding 1:1 ratio).

      The Court disagrees with Chicago Title's theory that the punitive damages award could

also be upheld on the grounds that it functions to compensate the company for losses sustained

beyond the period contemplated by the compensatory damages award.  (Doc. # 215, at 27-28.)

Such reasoning runs directly contrary to the dual purposes of deterrence and punishment

recognized under both federal and state law as justifying punitive damages.  There is no evidence

here that the jury applied such a "future losses" theory in arriving at the punitive damages here,

and to the extent that Chicago Title attempts to rely on that theory now, the dubious attempt is

wholly and absolutely unpersuasive.

      This leaves the third and final guidepost for determining whether the amount of punitive

damages awarded is impermissible: the difference between the jury's award of punitive damages

and the civil or criminal penalties imposed or authorized for misconduct comparable to that

found here. *State Farm*, 538 U.S. at 428. First American asserts that "the punitive damages in this case far outweigh any civil penalty that could have been assessed against defendants for comparable conduct. In fact, there is no comparable civil penalty in this case." (Doc. # 206, at 26.) Chicago Title in counters by drawing an analogy between the conduct at issue here and the unfair competition prohibitions contained in The Lanham Act, the Ohio Consumer Sales Practices Act, and various other attenuated statutes–violation of which often carries penalties of up to treble or quadruple the actual damages a party suffers. Such reference to these statutes provides some limited support for Chicago Title's defense of its punitive damages award, although this skeptical Court is cautious in wholly endorsing these statutes as truly comparable conduct. In any event, even drawing no firm conclusion on this point, the Court recognizes that the balance of the factors considered above favors Chicago Title's position in regard to both First American's federal and state due process concerns. Although the Ohio Constitution certainly applies with independent force here, *see Dardinger v. Anthem Blue Cross & Blue Shield*, 98 Ohio St. 3d 77, 781 N.E.2d 121 (2002), its protections yield no different a result than that produced by the foregoing analysis. Given the amount of profit First American generates on a daily basis, the Court can only conclude that anything less than the award here would fail to punish First American for its misconduct and perhaps deter such future transgressions. This does not punish First American for being successful; rather, it merely punishes the company for achieving a portion of its success through tortious means tainted with malice.

First American also asserts, however, that "a punitive award of this size for this type of injury has no precedent in Ohio. It is higher than the largest punitive damages award ever upheld on appeal in state history, and is over eight times that of the highest Ohio punitive award

in an economic injury case."  (Doc. # 206, at 1.)  But this argument does not accommodate either the high compensatory damages involved in this case or the specific facts underlying this litigation.  Moreover, the company's Ohio-centered ratio argument fails to recognize that Ohio courts have endorsed punitive damages awards far exceeding the ratio involved here.  *See, e.g., Fisher v. Barker*, 159 Ohio App. 3d 745, 825 N.E.2d 244 (Ohio App. 2d Dist. 2005) (holding that "a reasonable amount of punitive damages in relation to the award of compensatory and nominal damages in the amount of $600 is $5,000"); *Julian v. Creekside Health Ctr.*, No. 03MA21, 2004 WL 1376214, at *9 (Ohio App. 7th Dist. 2004) ("Ohio courts have held that doubling the amount of compensatory damages for a punitive damages award is not excessive").

In arguing against the award, First American asserts that the punitive damages award at issue is the product of passion and prejudice.  The company attacks various remarks by Chicago Title's counsel in an effort to demonstrate that the latter obtained its award by inflaming the jury. Given that the jury's verdict necessarily meant that the jury found that at least most of First American's witnesses were untruthful in their accounts and excuses, the Court finds curious the company's contention that "[t]o say in closing argument that First American ... acted with deceit, and that such conduct was a basis for punitive damages, is nonsense."  (Doc. # 206, at 31.)  The jury's verdict meant that the jury found that First American acted with actual malice and deceit during the course of the actions constituting the core of this litigation.

Equally unpersuasive is the previously rejected suggestion that Federal Rule of Evidence 411 applied here and precluded admission of the indemnity agreement.  That relevant agreement was not insurance and provided a key causal link in Magnuson's motivations, as well as the motivations of First American, and thus spoke to the issue of intent *in addition to* the issue of

20

punitive damages. Its probative value far outweighed the consequent minimal risk of prejudice.

Finally, the Court concludes that the overwhelming weight of the evidence favors Chicago Title. To conclude otherwise would be to ignore the numerous instances of substantial misconduct displaying malicious intent that First American attempts to dismiss as minor missteps by a company wholly concerned with the rights of its chief competitor. Such a misreading of the evidence is neither warranted nor possible in light of the facts adduced at trial.

Because the jury's punitive damages award is not excessive, much less grossly excessive, there is no basis for remittitur here. First American's attempt at apparent retroactive application of state law also does not provide a basis for undercutting the jury's decision. Accordingly, in light of the foregoing discussion, the Court **DENIES** First American's motion for judgment as a matter of law or a new trial, or, in the alternative, motion for remittur based upon punitive damages issues. (Doc. # 192.)

### C. First American's Motion on Causation and Compensatory Damages Issues (Doc. # 193)

First American presents five theories that it claims warrant either judgment as a matter of law or a new trial in this case. The Court shall address each argument in turn.

#### 1. Proximate Cause/Wrongful Acts and Sufficient Evidence of Causation

Despite the fact that no side requested a liability instruction in this case, First American initially argues that causation is lacking in this case because the damages awarded were predicated on the issue of Magnuson's role in the recruitment of employees,[1] which no finder of

---

[1] The Court recognizes that First American has attempted to predicate its motion in part on the fact that Chicago Title's counsel described its theory of the case on its website as "novel." (Doc. # 207, at 1, fn.1.) First American is thus improperly attempting to introduce evidence

fact determined had constituted a breach of the non-compete agreement induced by First American.  To support this argument, the company directs this Court to its prior summary judgment decision and the limited number of specific acts that the Court found as a matter of law constituted breaches of the non-compete agreement.  First American then assigns that decision an overly preclusive narrowing effect, in effect telling the Court that it has misconstrued the effect and meaning of its own decision.

In response, Chicago Title correctly points out that this Court's decision on the various summary judgment motions stated that the Court was entering partial summary judgment on the issue of liability, with "the issue of damages ... reserved for trial, at which time the question of Magnuson's extent of involvement and the effect of that involvement will determine the range of damages, nominal or otherwise."  (Doc. # 98, at 15-16.)  The Court does not find this holding to be ambiguous.  That Opinion and Order found enough uncontroverted evidence–set forth in an illustrative but not complete list of misconduct–to warrant summary judgment on the issue of liability.  But the Court's Opinion and Order did not purport to, and did not, foreclose examination of the *extent* of the impermissible actions of First American and Magnsuon.  In other words, the Court found that First American was at best liable for several select acts and potentially on the hook as a result of additional, even more pervasive acts if those acts were the proximate cause of damages.

This is because the improper inducement involved here linked First American's tortious conduct to Magnuson's acts.  Chicago Title properly introduced evidence of these acts.  Such

---

from outside the trial record to undercut the trial proceedings.  Further, even if the Court were to consider First American's "evidence" relevant, the fact that the theory of the case is atypical does not mean that it is necessarily or even presumptively invalid.

evidence was in fact necessary in order to determine what effect, if any, First American's misconduct had on Chicago Title. Thus, the Court's decision was, as Chicago Title's briefing provides, not "a **limitation** on liability, [but] a **finding** of liability." (Doc. # 216, at 2.)

Such a characterization arguably carried over to the parties' pre-trial stipulation, which also on its face contemplated inquiry into recruiting and the recovery of damages. (Doc. # 149.) That document expressly stated:

> To the extent the conduct at issue in Count I and/or Count II proximately caused any Chicago Title employees to terminate their business relationships with Chicago Title, and to the extent such termination of business relationships in turn proximately caused Chicago Title to incur business losses (including lost revenue from customers that moved their business), then any resulting damages (including lost profits to Chicago Title) are recoverable on Counts I and II, notwithstanding the dismissal of Count IV.

(Doc. # 149, at 1-2.) The Court need not discuss that document at length here, however, because in addition to this stipulation and the Court's own pre-trial summary judgment decision addressing the issue, counsel for all the parties signed and submitted a joint final pretrial order of relevance. That document stated that a "[c]ontested issue of fact" remaining for trial was "*[t]he extent of Magnuson's involvement* and the effect of that involvement to determine the range of damages, nominal or otherwise, on plaintiff's claim of tortious interference with contractual relations against First American." (Doc. # 102, at 7-8, emphasis added.) Given that First American and Magnuson understood before trial the scope and effect of the Court's summary judgment decision, their subsequent disavowals here and at trial (Tr. at 127-32) of that understanding ring hollow.

First American's disavowal of that understanding at trial also raises another point. Early in the trial, First American argued that the findings of breach set forth in the summary

23

judgment decision constituted the total number of breaches relevant to a liability determination. First American's counsel stated that the Court had found that liability existed based on several specifically delineated facts and that he did not "think it's open for either side, to add to liability or to subtract from liability from [the Court's] ruling." (Tr. at 129.)  According to First American, the "other acts" evidence would thus merely have been "piling on" because the Court had "already determined liability." (Tr. at 129.)  The company also asserted that introducing additional acts by Magnuson would simply be "show[ing] that liability again." (Tr. at 130.) Thus, according to First American at trial, the Court not only erred in permitting "other acts" evidence for any purpose, but also would have erred in permitting the introduction of that evidence for the specific purpose of establishing liability.

First American's argument at trial contrasts with the company's position now, where First American's argument implies that if the summary judgment decision was not preclusive of all other acts,[2] then using the "other acts" to establish liability would have been not only appropriate but an instruction on the issue was in fact necessary.  The absence of a specific

_____

[2]  At trial, First American argued that both sides were limited only to the breaches specifically set forth in the Court's summary judgment decision. (Tr. at 127-29.)  Post-trial, First American asserts that its argument "is ... *not* that jury instructions should have been given on the recruitment case in the first instance.  Again, the Court had already ruled that the jury was *precluded* from reaching determinations of liability.  Instead, the fundamental error that occurred is that the jury awarded damages for conduct that the Court expressly determined that Chicago Title had not proven was wrongful and then Chicago Title dismissed the only claim related to that conduct so that it would not have to prove liability on that conduct." (Doc. # 219, at 21-22.) First American also asserts that it "does not dispute that the Court's summary judgment order is not an exhaustive or exclusive list of potential wrongful conduct by Mr. Magnuson." (Doc. # 219, at 14.)  But given the language and meaning of the prior decision at issue, First American's argument is in direct contravention of (1) the summary judgment decision, (2) the scope of the claims constituting Counts I and II, and (3) First American's own argument at trial that further inquiry into liability was precluded because it would have been mere surplusage.

liability instruction cannot be substantial error causing prejudice given First American's arguments against liability at trial and in light of the fact that no reasonable juror could have found that the "other" conduct about which First American now complains did not constitute breaches of the non-competition agreement.  First American argues that "[i]f the jury had been permitted to make a liability determination related to Mr. Magnuson's alleged recruitment ... Chicago Title would have had to prove that Mr. Magnuson's actions in recruiting Chicago Title's employees rose to the level of violating his covenant not to compete, something that would have been difficult, if not impossible, given that there was no provision in Mr. Magnuson's contract prohibiting solicitation of Chicago Title's employees."  (Doc. # 207, at 10.) But this argument misstates the issue.  The non-competition section *was* such a provision *when the recruitment effort employed Magnuson as the recruiting tool*.  Even First American's own president, Gary Kermott, in fact testified that Magnuson's direct or indirect involvement in recruiting would be a violation of the non-compete agreement.[3]  (Tr. at 2421-24.)  The

---

[3]  Without explanation–perhaps understandably–First American "put[s] aside whether Mr. Kermott's testimony was taken out of context."  (Doc. # 207, at 15-16.)  It was not.  Rather, Kermott admitted that if the facts established that Magnuson participated in recruiting, then Magnuson breached his non-compete agreement.  Although the Court agrees that Kermott "does not make findings of liability" (Doc. # 207, at 16), he on behalf of his company can certainly *admit* liability.  Assuming *arguendo* that First American is correct that the "other acts" target liability first and initially not proximate cause issues, the Court is hard pressed to discern prejudice to the company in light of Kermott's notable admission.  In other words, after admitting that if recruiting by Magnuson occurred, then it would constitute a breach, First American now complains that the jury might have considered such recruiting to be a breach. Whether by a pretrial stipulation admitting liability, by a summary judgment concession of liability, or by an at-trial admission of liability, a confession of liability is a confession of liability.  The admission here negates First American's argument that "[t]he jury simply had to assume and was misled into believing that it could make its proximate cause determination based on that recruitment conduct and award damages based on that recruitment conduct without linking it to any conduct that had been determined to be actionable."  (Doc. # 219, at 23-24.)

25

company's theory of the case was simply that Magnuson never engaged in such recruitment, and

to the extent he may have, it was not the proximate cause of any damages.  First American's

business plan called for such recruitment, however, and Court-found breaches connected First

American to inducing Magnuson's improper involvement.

First American argues in its reply memorandum that Chicago Title could not produce

evidence at trial of the recruiting at issue because the Court had "refused to find liability for

recruitment" in the summary judgment decision.  (Doc. # 219, at 3.)  That contention ignores that

the Court declined to decide the recruitment issues via summary judgment only because genuine

issues of fact dominated that aspect of the case, not because the recruitment theory lacked merit.

Magnuson's role in recruiting was an extension of his breach of contract, which in turn arose

from First American's inducement.  Although the recruitment constituted a dismissed claim

pertaining to the relationship between Chicago Title and its former employees, it was also a

component of the undismissed claims and therefore figured into the trial.[4]  With every act that

resulted in the recruitment of employees, Magnuson was competing against Chicago Title in

contravention of his non-competition agreement and as a consequence of First American's

tortious misconduct.  It was for the jury to determine whether this conduct proximately caused

any damages.

This latter point suggests that even if the jury would have benefitted from additional

instructions outlining specifically the criteria for the recruitment conduct, there can ultimately be

no prejudice to First American.  For the jury to have awarded compensatory damages based on

recruitment, the jury had to have found that the recruitment acts in question proximately caused

---

[4]  The Court recognizes that "other acts" evidence, such as evidence of First American
using Magnuson for recruiting purposes, was also admissible for the separate purpose of
establishing malice in the punitive damages component of this case.

damages to Chicago Title.[5]  If the jury found that the acts caused such damages, then the jury

necessarily found that the acts affected constituted competition that the non-compete agreement

forbid.  In other words, to use First American's own example (Doc. # 207, at 5), if Chicago Title

put evidence before the jury that Magnuson worked in Georgia, this evidence–even in the

absence of a liability instruction excluding the utility of this evidence–could not prejudice First

American because it would not by itself provide proximate cause of relevant compensatory

damages.

      Chicago Title tried its case to demonstrate proximate cause, damages, and a foundation

for punitive damages.  First American and Magnuson mounted a defense to such a case, and both

sides presented proposed instructions in accordance with that understanding of the issues

involved.  To the extent that First American's memorandum in support could conceivably be

construed as asserting that the jury should have determined explicitly the effect of each act of

misconduct through itemization–a request not contained in their proposed interrogatories, and

one which the company disavows in its reply memorandum–such a contention belies the general

nature of a finding of breach and the consequent establishment of liability.  The law does not

require such express specificity.  *Cf. UZ Engineered Prods. Co. v. Midwest Motor Supply Co.*,

147 Ohio App. 3d 382, 399-400, 770 N.E.2d 1068, 1082-83 (Ohio App. 10th Dist. 2001).

      The foregoing analysis renders First American's argument unpersuasive.  First American

asserts that it did not have to request an instruction because the recruitment claim was dismissed

and because the issue under consideration targets the fundamental fairness of the trial.  The

former argument ignores, however, the already discussed fact that the recruitment was a

---

     [5] The jury could also have awarded compensatory damages related to conduct other than
Magnuson's employee-recruiting efforts, such as his admitted involvement with procuring for
First American Coldwell Banker King Thompson business in 2003.

component of the remaining claims in addition to the dismissed claim. A request for an instruction would therefore not have been an exercise in futility. The latter argument ignores the fact that the trial was indeed fundamentally fair.

Having found that handling at trial of the "other acts" evidence was proper and that any error in such handling was induced in part and then cured by First American's own actions and admissions, the Court need not discuss First American's narrow, contingent issue of whether those breaches of the non-compete specifically set forth in the summary judgment decision sufficiently support the damages proven and awarded. First American asks this Court to focus on just those specific breaches, but the foundation for the damages awarded is greater than simply the summary judgment decision's reference to specific breaches. First American's contrary premise fails to present an issue that evades mootness given the company's admissions and induced trial conduct, as well as the rationale discussed above. Moreover, in light of the foregoing evidence and admissions, in addition to the thorough review of the evidence set forth in Chicago Title's memorandum in opposition and adopted herein, the jury verdict is simply not against the weight of the evidence so as to warrant a new trial or judgment as matter of law. (Doc. # 216.)

## 2. Duration of the Non-Compete Clause

The Court determined at trial that the non-competition covenant extended until December 31, 2006 and instructed the jury accordingly. In its third ground for relief, First American asserts that a new trial is warranted because Chicago Title failed to prove by clear and convincing evidence that a legitimate business interest supported the agreement and that the agreement was reasonable. Chicago Title in turn asserts that the covenant not to compete serves to protect its purchased assets and to protect the interests arising out of Magnuson's employment. The company also again suggests that it does not have the burden of proving the reasonableness of

28

the non-competition agreement, but argues that even if it does, it met its burden at trial.

As discussed in previous decisions, the Sixth Circuit has discussed the relevant inquiry

associated with a non-competition covenant:

> Under Ohio law, a court must examine a non-competition covenant to determine the reasonableness of the restrictions. *Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 325 N.E.2d 544, 547 (1975).  To make that determination, the court should consider the absence or presence of a long list of factors: whether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possesses confidential information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and experience, whether the benefit to the employer is disproportionate to the employee's detriment, whether the covenant destroys the employee's sole means of support, whether the employee's talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment.  *Id.*
>
> The *Raimonde* court summarized these factors by concluding that a non-competition covenant "is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public."  *Id.*  If the covenant does impose unreasonable restrictions, the court still must enforce the covenant "to the extent necessary to protect the employer's legitimate interests."  *Id.*

*Basicomputer Corp. v. Scott,* 973 F.2d 507, 512 (6th Cir. 1992).  *See also Rogers v. Runfola &*

*Associates,* 57 Ohio St. 3d 5, 8, 565 N.E.2d 540, 543 (1991).  Revisiting this inquiry, the Court

again concludes that the non-competition agreement–as voluntarily restricted in scope by

Chicago Title–is reasonable as a matter of law.

Contrary to First American's arguments, Chicago Title proved that a legitimate business

interest underlying the non-competition agreement existed both at the time the covenant was

made and at the time the company sought to enforce the agreement.  Chicago Title vice president

and state of Ohio manager Michael Nolan testified extensively about the importance of

relationships within the title insurance industry, including the relationships Magnuson held with

former Chicago Title customers and employees.  Nolan specifically testified that Chicago Title

required non-competition agreements when purchasing other agencies where the owners of the

29

purchased agency received employment agreements for the following purpose:

> [W]hen we buy an agency, we are really buying the relationships that that agency has.  And our belief is that the people that are selling the company, the principals, are the key relationship drivers of the business for both the employees of the agencies and the customers.  So as a standard course of business, we require that the principal seller sign employment agreements and include noncompetes in that.
>
> And in fact we typically don't buy agencies unless the principals want to stay on and run the business.

(Tr. at 306-07.)  Nolan expanded on this explanation when further questioned by counsel:

> Q.  Why is that?
>
> A.  Because of our concern that they are, again, the keys to maintaining the business.  They have the customer relationships, the employer relationships, and that if we bought a business and the owners left, that it would be much harder to maintain the business.
>
> Q.  And based upon your knowledge and understanding as an officer and Ohio manager for Chicago Title, does Chicago Title believe that this is necessary to protect its business interests?
>
> A.  Absolutely.
>
> Q.  And if you could also explain why that is?  Were there any additional reasons for why that is, or did you just explain it?
>
> A.  I think I explained it.  It's to protect the customer relationships and the employer relationships that we feel are controlled by the owners of the agencies that we buy.  And that's why we require – Not only do we want them to sign employment agreements, but we want a noncompete that runs past their employment so that when they leave, we have time to secure those relationships ourselves.

(Tr. at 307.)

> Counsel then inquired as to the specific non-competition agreement involved in this case:
>
> Q.  And based upon what you have learned about the background of the business that was purchased here by Chicago Title and what you have learned about Mr. Magnuson and Mr. Steller and their background and the agency, do you believe that it was necessary to have a duration of five years after the term of the agreement in order to protect Chicago Title's business interest?
>
> A.  Yes.

Q. And why is that?

A. Well, the term gives you time to secure the relationships. And particularly when you have individuals that are paid a lot of money for a business, that gives them time to sit on the sidelines if they need to. And they also had law practices that they could go back to, of they needed to. And we just, I think he company felt they needed a long period of time.

(Tr. at 308.)

First American argues that, despite this testimony, Chicago Title failed to present any evidence that these concerns existed in 2002. But the same concerns that led to the original formation of the covenant inescapably animated its application following the expiration of Magnuson's extended employment contract. To conclude otherwise would be to ignore the substance of Nolan's testimony. Even Kermott, First American's president, testified that he agreed that the non-competition agreement "makes sense because Chicago Title had purchased [Magnuson's] business, and he was a key employee of the business when they purchased it; and oftentimes when businesses are purchased, noncompetes are done to protect the investment." (Tr. at 199.) Such testimony recognizes and reinforces Chicago Title's proffered reasons of protecting its purchased assets and protecting the interests arising out of Magnuson's continued post-sale employment–two interests that underlie the far greater latitude afforded restrictive covenants associated with the sale of a business.[6]

---

[6] Even one of the primary cases upon which First American relies recognizes that "covenants [not to compete] ancillary to the sale of a business 'are accorded far more latitude' than restrictive covenants ancillary to an employment contract." *Laidlaw, Inc. v. Student Transp. of America, Inc.*, 20 F. Supp. 2d 727, 754 (D.N.J. 1998) (quoting *Coskey's Television & Radio Sales and Serv., Inc. v. Foti*, 253 N.J. Super. 626, 633, 602 A.2d 789, 793 (App. Div. 1992)). Ohio law tracks this approach. *Basicomputer Corp. v. Scott*, 791 F. Supp. 1280, 1290 (N.D. Ohio 1991), *aff'd in relevant part*, 973 F.2d 507 (6th Cir. 1992). Although much of the reasoning of *Laidlaw* is informative, that case's fact-specific result is of little value here because it was an outgrowth of the fact that goodwill was of little import in the industry at issue in *Laidlaw*. 20 F. Supp. 2d at 756. In contrast, the evidence in this case supports the contention that personal relationships/goodwill drives the title insurance business in central Ohio.

Further, the evidence presented painted Magnuson as the key figure in the central Ohio title insurance industry, even if he was not the day-to-day point man with each customer. Carefully minimizing this evidence, First American posits that the goodwill Magnuson generated had dissipated by 2002 and had been replaced by Chicago Title goodwill. This argument dubiously fails to credit that the evidence reflected that Magnuson remained a critical component of the existing Chicago Title goodwill through his post-sale employment with the company; it also ignores Magnuson's exposure to Chicago Title's inner workings in Ohio. As Chicago Title recognizes, in fact, First American's entire business plan was premised on the hiring of knowledgeable "key" individuals such as Magnuson who had customer followings and the ability to recruit key employees with customer relationships.

First American also points at other individuals with whom Chicago Title did not have such a continuing non-competition agreement as evidence purportedly undercutting the agreement at issue here. Such reliance is misplaced. There is no evidence that these individuals were of equal stature as Magnuson, and one of them–Steller–had, unlike Magnuson, been out of the central Ohio title insurance loop for an extended period of time. First American's apples-to-oranges comparison fails to yield the fruitful disposition the company seeks.

Nor does First American's continued recasting of the evidence to diminish Magnuson's role successfully undercut Chicago Title's proffered justifications for the five-year duration of the non-competition agreement. First American again assumes that the factfinder believed each of the witnesses it references in making its argument. But the factfinder was free to disbelieve any or all of these witnesses and to elect to credit Chicago Title's evidence. Whether regarded as partially tied to the sale of his business or as only related to his employment post-1993, Magnuson's non-competition agreement was grounded in a legitimate business concern tied to his knowledge and connections.

32

First American's theory that the non-competition agreement bars fair competition because Chicago Title failed to solicit non-competition agreements from its lower-level employees is also unpersuasive.  This curious rationale seeks to excuse Magnuson's failure to honor his bargained-for and paid-for obligations by blaming the victim.  Further, as Chicago Title suggests, First American's argument overlooks the unique role Magnuson held within the central Ohio title insurance business–a role that supports the covenant not to compete. Enforcement thus does not stifle fair competition, because First American is certainly free to recruit Chicago Title employees by proper means.  First American only cannot use unfair business practices, such as improperly using Magnuson as a recruiting tool.

The Court also notes that First American asserts that the plain terms of the non-competition agreement serve to void a 2006 duration.  This argument, a portion of which the company asserts in repackaged form for the first time, ignores the fact that Magnuson voluntarily extended the agreement terms, the fact that the agreement is driven by more than just goodwill–such as the actual active services of Magnuson–and the fact that, as the Court has repeatedly held, the agreement does *not* impose an over-fifteen-year covenant not to compete. Such a construction of the agreement is without foundation and merit.  The non-competition agreement did not govern Magnuson's conduct while he was an employee of Chicago Title, but instead applied to his post-employment activities.

Chicago Title therefore demonstrated the reasonableness of the covenant not to compete. The company had legitimate business interests underlying the agreement, and the covenant imposes limited temporal and spatial limitations that still enable Magnuson to work in the same industry in the same state.  Driving this agreement in part is the fact that while at Chicago Title (and its offspring), Magnuson had considerable customer contact and relationships, as well as exposure to the inner workings of his former employer.  The non-competition agreement bars

Magnuson from acting as a direct competitor in a specific market, a condition to which he agreed and for which he received compensation and sustained employment for over ten years, while still enabling Magnuson to apply his skills and experience in other markets. The agreement was not incidental to Magnuson's employment with Chicago Title, but a critical component of the sale and employment. In contrast, the effect of the restrictions on Magnuson in central Ohio are arguably incidental to his purported main employment with Talon.

The Court therefore again concludes that under the specific circumstances of this case, the covenant not to compete is reasonable because it is no greater than is required for the protection of Chicago Title's legitimate business interests, does not impose undue hardship on others, and is not injurious to the public. The Court thus reaffirms its prior decision that the as-limited non-competition agreement extends until December 31, 2006.[7]

### 4. *Lost Volume Seller*

At trial, the Court held as a matter of law that Chicago Title was a lost volume seller and therefore had no duty to mitigate its damages. The Court then instructed the jury not to consider mitigation. First American contends that such action was error because Chicago Title had failed to prove that it was a lost volume seller. The company also asserts that it had presented enough evidence countering Chicago Title's position that, at best, the Court should have permitted the issue to go to the jury.

One commentator has explained the lost volume seller concept as follows:

> The profit the seller would have made may be recovered when the aggrieved seller is a so-called "lost volume" seller, that is, one whose supply of the goods in question exceeds the demand therefor, and who therefore can readily

---

[7] Having reached this conclusion, the Court need not and does not opine on whether Chicago Title is correct in asserting that a new trial would not be warranted even in the face of error because the damages awarded would nonetheless remain permissible and appropriate. (Doc. # 216, at 28 n.11.)

resell the goods to another buyer at a standard price (usually the same list price the breaching buyer would have paid, causing there to be no difference between the market price and the contract price) which, although it will generate a profit, will not adequately compensate the seller for the particular profit lost as a result of the lost sales opportunity caused by the buyer's breach.  In other words, even though such a seller can resell the goods to another buyer and realize the usual profit, it could have sold like goods to the other buyer and obtained the same profit, and therefore should be compensated for the profit not realized on the specific sale to the breaching buyer.

24 *Williston on Contracts* § 66:26 (4th ed.) (footnotes omitted).  *See also id.* at § 64:28;

*Restatement (Second) of Contracts* §§ 347, cmt. f, and 350, cmt. d (1981).  Tracking § 350,

comment d of *Restatement (Second) of Contracts*, courts have recognized that the lost volume

seller theory encompasses the sale of services.  *Evergreen Int'l Airlines, Inc. v. Asiana Airlines*,

136 Fed. Appx. 95, 97 (9th Cir. 2005) (collecting cases applying lost volume seller concept to

service providers).

The parties disagree as to whether a seller claiming lost-volume-seller status must

demonstrate an actual secondary sale, or resale, of services for each sale lost.  First American

asserts that "a lost volume seller must have capacity, intent, and the actual existence of the

'second sale.' " (Doc. # 219, at 28.)  Chicago Title labels First American's argument as a gross

mischaracterization of the law and asserts that the key issue is whether the company would

have–as opposed to did–complete second sales.[8]  (Doc. # 216, at 54-55.)

It appears that Ohio law indeed requires more than a single sale to qualify as a lost

volume seller.  *Modern Marine, Inc. v. Van Allen*, No. 42922, 1981 WL 10432, at *2 (Ohio App.

8th Dist. June 25, 1981) (holding one sale over seven months insufficient to prove lost volume

seller status).  But this Court's research and First American's citations fail to reveal *any*

───────────────

[8]  Although Chicago Title did not prove at trial the actual existence of one wholly independent, actual third-party sale of the same character for *every* sale lost, the company did produce evidence of some "second" sales of the same character (such as residential resale transactions).

jurisdiction that apparently requires an actual replacement sale for *every* sale lost.[9]  This lack of explicit support for First American's theory no doubt is linked to the fact that the seminal work of the lost volume seller doctrine expressly obviates such a requirement.

The actual term "lost volume seller" is generally traced back to Professor Robert J. Harris' law review article *A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial Code Results Compared*, 18 Stan. L. Rev. 66 (1965).  That text set forth the leading discussion on the lost volume seller doctrine.  Professor Harris explained the concept as follows:

> Resale result in loss of volume only if three conditions are met: (1) the person who bought the resold entity would have been solicited by plaintiff had there been no breach and resale; (2) the solicitation would have been successful; and (3) the plaintiff could have performed that additional contract.

*Id*. at 82 (footnotes omitted).  Notably, for present purposes, the article specifically discusses that a seller can be a lost volume seller even where there has been no actual resale prior to trial.[10]  *Id*. at 81 (explaining how to compute damages when there is lost volume and "[w]here there has been no such resale before trial"), 82 (stating that "[i]f there was no actual resale, the court must determine whether the purchasers available at the time plaintiff should have resold would have met the three conditions" set forth above).

---

[9]  The *Modern Marine* court found that because only one sale in seven months existed for a particular type of boat–the specific sale at the heart of that litigation–the seller was not a lost volume seller.  1981 WL 10432, at *2.  The fact that the state court looked at both the period *before* and after the breach to examine relevant sales arguably suggests that it is the ability to sell and not an actual "second" sale that is the focus of a lost volume seller inquiry in Ohio.

[10]  Other commentators agree.  *See, e.g.*, W. Hugh McAngus, Jr., *Collins Entertainment Corp. v. Coats & Coats Rental Amusement Opens the Door for Lost Volume Sellers, but Does Not Fully Invite Them In: An Examination of the Adoption of the Lost Volume Seller Doctrine in South Carolina*, 56 S.C. L. Rev. 693, 695 (2005) ("a seller who is determined to be a lost volume seller is entitled to the profits from the original breached contract, regardless of whether it has entered into a subsequent transaction"); Gregory M. Travalio, *Measuring Seller's Damages for Breach of Long-Term Gas Purchase Contracts*, 14 E. Min. L. Found., § 23.03[2] at 23-13 (1993) (explaining that a seller can qualify as a lost volume seller under Uniform Commercial Code § 2-708(2) even where the trial occurs before all resales are completed).

Although often dealing with facts in which there has been an actual second sale or resale–and although almost always stating the doctrine in a manner that recognizes the actual resale–case law also reflects Professor Harris' understanding that a possible sale that a seller could and would make is sufficient for classification purposes, even if not actually concluded.  In *C.I.C. Corporation v. Ragtime, Incorporated*, for example, an appellate court addressing the lost volume seller doctrine embodied in *Restatement (Second) of Contracts* § 350, comment d, recognized the import of an unrealized second sale or resale:

> Where, as here, a plaintiff lessor agrees to lease an article of which the supply in the market is for practical purposes not limited, then the law would be depriving him of the benefit of his bargain if on the breach of the agreement, it required his claim against the lessee to be reduced by the amount he actually did *or reasonably could realize* on a reletting of the article.  For if there had been no breach and another customer *had* appeared, the lessor could as well have secured another such article and entered into a second lease.  In the case of the breach of the first lease, he should have the benefit of both bargains or not–in a situation where the profit on both would be the same–be limited to the profit of the second of them.

*Id*., 319 N.J. Super. 662, 668, 726 A.2d 316, 320 (1999) (quoting *Locks v. Wade*, 36 N.J. Super. 128, 130-31, 114 A.2d 875, 876-77 (1995)) (emphasis added).  Further, not all courts require that an injured party be able to identify precisely a specific resale buyer in order to claim lost volume seller status.  *R.E. Davis, Chem. Corp. v. Diasonics, Inc.*, 924 F.2d 709, 711-12 (7th Cir. 1991).

Therefore, in light of this correct understanding of the lost volume seller doctrine, the extant issue before the Court at trial and again today is thus whether Chicago Title could have and would have handled new business in addition to the business it lost to First American.  *See Lake Erie Boat Sales, Inc. v. Johnson*, 11 Ohio App. 3d 55, 56-7, 463 N.E.2d 70, 72-3 (Ohio App. 8th Dist. 1983) (explaining that party seeking lost volume seller status must present sufficient evidence that it is a lost volume seller).

In an attempt to show that Chicago Title failed to prove that it was a lost volume seller in

2003, First American cites to the testimony of a number of witnesses. Necessarily crediting this often-disputed testimony, the Court nonetheless notes that the referenced testimony of First American's Jack Wiese, Caryl Caito, Bonnie Lustnauer, and Barbara Conley regarding Chicago Title's capacity, ability, and strategy all targeted 2002, which is not the time period in question. Further, First American's reliance on the testimony of Chicago Title's Randall Berry to prove its point similarly overlooks the fact that the referenced testimony concerns Wiese's instructions to Berry concerning Chicago Title's purported 2002 capacity and strategy. There was no testimony that Wiese's decisions reflected more than his specific policies, and there was testimony that following Wiese's departure, Chicago Title did not adhere to his contested policies. Of significance is that none of the foregoing witnesses' cited 2002-centric testimony informs Chicago Title's abilities and strategy in 2003, when Chicago Title asserts it began to lose profits. The testimony First American references therefore failed and fails to create the genuine issue of material fact that First American claims exists.

In contrast, Chicago Title offered uncontroverted testimony as to its status in 2003. Chicago Title supervisor Michael Nolan testified that the company could and did increase its operations in 2003. (Tr. at 569-70.) Chicago Title manager Randall Berry testified that his company had a higher percentage of transactions in 2003 than 2002, that Chicago Title would have been able to handle all the 2003 transactions it had and all the transactions it lost to First American, and that the company would have done "[w]hatever we needed to do to make sure that we could handle the business." (Tr. at 1580-81.) This latter point is relevant because even if a party "could not handle more business without expansion ... or drastic revision of [its] mode of doing business," that party can overcome the consequent rebuttable presumption that it did not intend to solicit another order "by evidence that plaintiff in fact planned such expansion or revision." *A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial*

*Code Results Compared*, 18 Stan. L. Rev. at 82.

First American attempts to discredit Chicago Title's evidence by arguing that the additional transactions Chicago Title obtained in 2003 were not of the same quality and character as those lost to First American.  First American also argues that Chicago Title failed to prove that it would have made the approximately 2,633 lost transactions.  The former suggestion misses the point that Chicago Title was not required to show other actual transactions for all the lost transactions, and the latter suggestion contradicts without support the only evidence relevant to Chicago Title's 2003 business practices.

The Court thus reaffirms its conclusion that, even construing the evidence in favor of First American, reasonable minds could only come to one conclusion favoring Chicago Title.  There is no evidence in the record that Chicago Title actually turned away or would have turned away business during the relevant period.  Absent such evidence, there is no factual basis that could have permitted even a reasonable inference that Chicago Title was not a lost volume seller during the relevant period in question; the only evidence on the issue supports that the company could and would have completed such transactions.  Chicago Title produced sufficient evidence to demonstrate that it was a lost volume seller, while First American failed to produce any evidence supporting the contention that Chicago Title was not a lost volume seller during the relevant time frame.  The consequent instructions to the jury regarding mitigation were therefore not erroneous, and First American has failed to demonstrate error necessitating entry of judgment as a matter of law or a new trial in connection with the lost volume seller/mitigation issue.[11]

---

[11]  The Court therefore declines to address Chicago Title's alternative argument that First American failed to request a mitigation jury instruction targeting the degree of successful mitigation as opposed to a failure-to-mitigate instruction.  Similarly, the Court expresses no opinion on Chicago Title's second argument that even if the lost volume seller decision were in

## 5. *Lost Profits Determination*

In its final ground for judgment as a matter of law or a new trial, First American argues that Chicago Title's lost profits calculation was based on an unproven assumption that the company's claimed market share would have remained constant throughout all market variations but for Defendants' wrongdoing.[12]  Specifically, First American contends that Chicago Title's damages expert, J. Michael Nesser, erred in using a one-month market share (February 2003) as the basis for his lost profit projections encompassing several years and that he failed to take into account the effect that market variations, such as interest rate changes, or factors such as joint ventures could have on Chicago Title's market share.

Chicago Title labels First American's argument "baseless" and "absurd."  (Doc. # 216, at 58.)  The company notes that Nesser's testimony was in large part tied to Berry's testimony, who independently testified as to the market-share theory of calculating lost profits.  Notably, Berry's testimony utilized a market-share approach for some of the lost business, but applied a different methodology for builder-business based on 2002 transaction numbers.  This latter point, ignored by First American, tracks the approach suitable for such damages and underscores the complexity of the total damages Chicago Title claimed.

The basis for Nesser's market-share analysis could lie in Berry's testimony.  First

_____

error, First American suffered no prejudice because it was able to present its "volume of transactions" argument to the jury.

[12]  In a footnote, First American also attempts to incorporate by reference the arguments presented by Magnuson in his motion for judgment as a matter of law or for a new trial.  (Doc. # 207, at 70 n.15.)  It is questionable whether such argument-by-incorporation complies with the Southern District's requirement that "[a]ll Motions ... shall be accompanied by a memorandum in support thereof which shall be a brief statement of the grounds, with citation of authorities relied upon."  S.D. Ohio Civ. R. 7.2(a)(1).  Assuming *arguendo* that First American has properly presented its alternative arguments via incorporation, the Court **DENIES** these arguments for the same reasons set forth below.

American argues that Nesser's reliance on Berry is an opinion formed on an opinion, not on sufficient factual evidence.  Berry provided that support.  Berry's testimony as to 28.6% market share used a lower number than the 2002 average market share of 32.5%, but Berry himself described his number as a conservative estimate.  Rather than representing a declining market as First American suggests, Berry's calculation indicates an apparent election to proceed with the most conservative number in mind.  In other words, although  it would have been questionable for the company to attempt to use a one-month figure that was higher than the average market share so as to over-represent its claimed damages, Chicago Title was free to under-represent its market share and thus its damages, electing to present the jury with a conservative one-month number *that was a subset of the average market share*.  Whether it used 28.6%, 10%, or .5%, Chicago Title was providing a claimed market share rooted in a 2002 average of 32.5%; the company arrived at 28.5% by selecting a low-share month just prior to the loss of business.  The factual evidence–the average numbers–supported the number Chicago Title presented to the jury, even if describing the 28.6% as representative of only one month fails to explain fully the nature and origins of that number.[13]  Thus, the market share used was not mere supposition.  Rather,

---

[13]  The Court therefore disagrees with First American's contention that "neither Mr. Nesser nor Mr. Berry made any attempt to utilize the available data dealing with variations in Chicago Title's market share in the *year* or years preceding 2003 to substantiate Mr. Berry's opinion as to the Underlying Assumption [that market share would have remained constant but for the alleged wrongdoing]."  (Doc. # 219, at 37 (emphasis added).)  As Chicago Title correctly points out, the market variables identified by First American are not company-specific but industry-wide variations.  Such variables would theoretically increase or decrease the market, of which Chicago Title asserts it would retain a consistent share of the expanding or decreasing pool of available business in the absence of improper competition.  The utilized market share properly reflects First American's variables because the apparently conservative 28.6% figure obtained in 2003 does not puncture the average 32.5% figure for 2002, the latter of which would necessarily reflect the effect of these variables throughout an entire year.  Thus, to the extent Nesser (or Berry) explicitly professed to used one month's market share and to assume only one causation, the number used in the calculations inherently represented a market share consistent with over a year's performance that implicitly, even if perhaps unintentionally, accounted for typical market fluctuations.

there was sufficient factual evidence in the record to support the number behind the testimony of both Berry and Nesser.

Nesser testified that his calculations were based on the premise that the lost business was fully attributable to Defendants' wrongdoing. (Tr. at 1674.) First American argues that Nesser was obligated to substantiate this assumption and to explore other possible proximate causes of the asserted damages. The Court agrees with Chicago Title that a witness such as Nesser–offered as a damages expert, not a causation expert–can properly rely on assumed facts in forming his projections where, as here, there is some support in the record for the assumptions. Moreover, to the extent the testimony at issue could speak to causation, Nesser was not required to engage in the inquiry First American promotes. The Sixth Circuit has explained that " '[i]n order to be *admissible* on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury.' " *Conwood Co., L.P. v. United States Tobacco Co.*, 290 F.3d 768, 794 (6th Cir. 2002) (quoting *Jahn v. Equine Servs, PSC*, 233 F.3d 382, 390 (6th Cir. 2000)).

There is thus no basis for concluding that the Court's appropriate jury instructions were rendered ineffective as First American asserts. As in *Conwood*, this is a case in which testimony indicated that absent improper conduct, a plaintiff would have had a general market share, and in which additional testimony produced a damages estimate in the same range as–but notably *greater* than–that which the jury actually awarded. The testimony at all times was subject to cross-examination, and First American was free to (but elected not to) have its own expert testify. Even without dueling expert testimony, however, the jury apparently credited Defendants' arguments to a limited degree, resulting in the less-than-requested damages award (that ultimately, as Chicago Title is quick to repeatedly point out, echoes Talon's revenues).

There was sufficient evidence to support the jury's award of damages. The Court

therefore concludes that First American's arguments for judgment as a matter of law or for a new trial are not well taken and **DENIES** said motion.  (Doc. # 193.)

### D.  Magnuson's Motion (Doc. # 194)

At the outset, the Court note that Magnuson's motion for judgment as a matter of law or for a new trial (Doc. # 194)  attempts to incorporate the entirety of First American's motion (Doc. # 193).  It is questionable whether this attempt at argument-by-incorporation satisfies the S.D. Ohio Civ. R. 7.2(a)(1) requirement that "[a]ll Motions ... shall be accompanied by a memorandum in support thereof which shall be a brief statement of the grounds, with citation of authorities relied upon."  Assuming *arguendo* that Magnuson has properly presented his arguments via First American's motion and its supporting memorandum, the Court **DENIES** these arguments for the same reasons set forth above.

The remainder of Magnuson's motion consists of an attack on Nesser's alternative valuation of Chicago Title's lost business at $10,769,590.  Magnuson assigns two errors here: that the Court permitted Nesser to testify using this methodology and that the Court excluded the testimony of proposed defense damages expert Lloyd Bell.

Beginning with the latter contention, the Court notes that Magnuson again asserts that the exclusion of the testimony of Bell was unfair.  This litigation has been marred by numerous–and often juvenile–disputes, including discovery disputes.  This resulted in expert reports by both sides that were less than ideal.

The Court's expert-related decisions attempted to provide the parties with a fair playing field that comported with the Federal Rules of Civil Procedure and the orders of this Court. Previously, the Court continued the trial date in order to permit Defendants to obtain an expert and to preclude Defendants from suffering any prejudice as the result of a flawed order by the Magistrate Judge.  (Docs. # 103, 104.)  The Court subsequently granted Defendants' motion for

an extension of the extended deadline in which to disclose their expert and his report.  (Docs. #

106, 107.)  Defendants, however, never disclosed an expert report by Bell as required by Fed. R.

Civ. P. 26(a)2)(B).  (Doc. # 166, at 8.)  Magnuson ignores this last fact and again (1)

characterizes the Meaden & Moore report authored by William Minadeo as a sufficient

replacement for Bell's non-existent report; (2) asserts that Minadeo's deposition responses can

be proper substitutes for Bell, who understandably was not deposed; and (3) states that the Court

excluded Bell simply on the basis of a failure to disclose information about that individual and

not on the complete failure to comply fully with their disclosure obligations.[14]

    The Court decided before trial that both Nesser *and* Minadeo could testify on

valuation–despite both sides' failure to comply ideally with the discovery rules and despite the

fact that Minadeo had produced a report apparently weakened in part by either the strategic or

accidental decisions of Defendants' trial counsel (and not to underhanded machinations as

Chicago Title's pre-trial briefing implied).  (Doc. # 166, at 11-12.)  This was perhaps not a

perfect compromise, but it was a fair compromise that obviated any prejudice to either side

caused by both just-sufficient expert reports.  The fact that Defendants elected not to put

Minadeo (their only properly disclosed expert) on the stand to contest the various calculations

that Chicago Title presented was a strategic decision.  That as a result Defendants put no

damages expert before the jury is not the fault of the Court and does not inform the proper and

appropriate exclusion of Bell.

--------

    [14]  In regard to this last point, Chicago Title states in its memorandum in opposition: "In a
troubling mischaracterization, Magnuson claims that the Court excluded Bell merely because he
'had not provided his curriculum vitae or a list of publications.' " (Doc. # 214, at 7 (quoting Doc.
#208, at 10).)  The Court is equally and deeply troubled by the statement of Magnuson's counsel,
but elects once again to give counsel the benefit of the doubt and assume that the wholly
incomplete characterization was a simple factual oversight resulting from poor drafting–or a
dubious attempt at substituting Minadeo's work for Bell's missing report–and not an unethical
misstatement intended to mislead either this Court or a reviewing court.

This leaves the issue of Nesser's testifying on the valuation calculation.  As noted, the Court regards Nesser's report as just-sufficient disclosure of this methodology.  His deposition helped to obviate the less developed portions of his report.  The most notable change in Nesser's valuation calculation at trial was his permissible decision to apply the average of the multipliers suggested by First American's Kermott.  *See* Fed. R. Civ. P. 703; *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 852 (6th Cir. 1981).  But, unlike in the distinguishable *Beller v. United States*, 221 F.R.D. 689 (D.N.M. 2003), this new information did not broaden the witness' testimony, but in fact constricted it, resulting in a tighter and smaller damages estimate.  And, as Chicago Title notes, Nesser explicitly disagreed with the notion that using the Kermott multiplier relied upon incorporating the value of chairs and such; Nesser in fact testified that the multiplier could be applied simply to profits.  (Tr. at 1742-43.)  The soundness of this position was open to vigorous cross-examination and is ultimately a question not of admissibility but of weight.

Further, even if permitting Nesser to testify as to the alternate valuation methodology of calculating damages were error, there is no prejudice to Magnuson (and, by extension, no prejudice to First American).  Chicago Title presented to the jury more than one method of calculating its damages, and the jury returned a verdict greater than the number produced using the valuation methodology but less then the two numbers produced using the methodology discussed above in connection with First American's motion.  In light of such a fact, the Court cannot say that the judgment was substantially swayed by prejudicial error necessitating judgment as a matter of law or a new trial.  *Beck v. Hsik*, 377 F.3d 624, 635 (6th Cir. 2004).  Magnuson's arguments to the contrary, such as his curious contention that the amount of time the jury deliberated *must* reflect that the jury did not properly analyze the case generally and damages specifically, do not serve to undercut this conclusion.  It assumes, without a foundation beyond self-serving speculation, that the jury did not follow the Court's instructions on the

deliberations, despite the presumption that the jury did in fact follow the Court's instructions to deliberate fully and justly.

The Court therefore **DENIES** Magnuson's motion for judgment as a matter of law or for a new trial.  (Doc. # 194.)

### III.  Plaintiffs' Motions

### A.  Motion for Entry of Permanent Injunction (Doc. # 196)

Chicago Title requests that this Court issue a permanent injunction enjoining Magnuson from various acts the company asserts are related to the non-competition agreement and enjoining First American from engaging in related specified conduct.  The company asserts that such injunctive relief is necessary to prevent Magnuson from violating the agreement in the future and to prevent First American from further inducing such breaches.  Defendants oppose these requests, arguing that Chicago Title has failed to prove the reasonableness of enforcing the non-competition agreement through December 31, 2006 and that the scope of the injunction sought is not unwarranted.

Courts have explained that to obtain a permanent injunction, a moving party must demonstrate (1) that the moving party has obtained actual success on the merits, (2) that irreparable injury will occur if the injunction does not issue, (3) that the threatened injury outweighs any harm the injunction may cause to the opposing party, and (4) that the injunction will serve the public interest.  *See, e.g., United States v. Miami Univ.*, 91 F. Supp. 2d 1132, 1147 (S.D. Ohio 2002).  *See also Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987).  Merging the last two factors, some courts have characterized the standard as a three-part test in which, in addition to proving actual success on the merits and irreparable injury, the moving party must prove that "[t]he balance of the equities weighs in favor of the entry of the permanent injunction."  *National Interstate Ins. Co. v. Perro*, 934 F. Supp. 883, 889

(N.D.Ohio 1996).

Because the Court has already discussed both above and in previous Orders how Chicago Title has satisfied the applicable *Raimonde* factors, demonstrating that the non-competition agreement reasonably extends until December 31, 2006, the Court need not and shall not reproduce that incorporated analysis in this section.  The Court does note, however, that the same concerns that supported the original formation of the non-compete agreement existed at the time of Magnuson's departure from Chicago Title (and by logical extension exist today).[15]

The Court shall also not reproduce here its prior discussions of why Defendants' argument that Chicago Title cannot demonstrate actual success on the merits is flawed.  Their argument again depends in part on Defendants' continuing overly narrow reading of the scope and effect summary judgment decision and their insistence that recruitment assistance cannot be a part of the claim against Magnuson.  The Court has fully discussed and rejected both points.  Chicago Title has prevailed on the merits, which satisfies the first prong of the Court's permanent injunction inquiry.

The Court has also previously set forth at length how the absence of enforcement of the injunction would result in likely irreparable harm that money damages cannot fairly and fully compensate.  Defendants argue that an injunction would punish them twice, once through the money damages constituting the jury's award and once through injunctive relief.  But this argument misses that the injunctive relief sought would target uncompensated *additional* future harm that is not embodied in the compensatory damages awarded linked to prior misconduct, but instead would arise from *additional* future misconduct.  *See Overholt Crop Ins. Serv. v. Travis*,

---

[15] Defendants again assert that Chicago Title conceded the expiration of its goodwill interest by previously offering Magnuson a proposed contract with a post-employment restrictive covenant of one year.  The Court rejects this argument because it is grounded in unsupported speculation as to Chicago Title's negotiating motives.

941 F.2d 1361, 1371 (8th Cir. 1991) (explaining that although money damages compensated a party for current misconduct that had effects extending into the future, injunctive relief protected that party from the further erosion of additional customers caused by future misconduct). The harm that future misconduct would cause in the absence of an injunction–the loss of goodwill, fair competition, and reputation–support entry of a permanent injunction. Chicago Title's remaining proffered justification, that proving lost profits for any future harm (different the harm involved at trial) would be difficult and therefore an inadequate remedy, provides much less, if any, support for the entry of a permanent injunction.

In regard to the balancing of the equities, the Court again concludes that Chicago Title prevails. The Court has already noted the benefit the company would receive from an injunction. Against the probable harms Chicago Title would suffer in the absence of a permanent injunction, the Court has balanced the effects on Magnuson and First American. The Court has also previously recognized that an injunction enforcing the fair non-competition agreement does impose some limited burdens on Magnuson. But the Court has recognized that such hardships are not undue burdens and do not outweigh the right of Chicago Title to enforce its reasonable agreement. Moreover, any hardship on First American is self-inflicted hardship; the company induced Magnuson's misconduct, and equity demands that it not be allowed to profit from this calculated business decision. This latter conclusion, as well as the societal interest in the enforcement of a valid, reasonable restrictive covenant, compels this Court to conclude that permanent injunctive relief favors the public interest. In light of these conclusions, and except as noted below, the Court finds that Chicago Title's tailored requests for specific prohibitions fairly outweigh the burdens on Magnuson and First American. To the extent that Chicago Title has overreached in its requested restrictions–such as by asking for an overly broad restriction on social outings–the Court has reformed the requested prohibitions actually imposed.

Chicago Title has presented evidence that Magnuson, induced by First American, has repeatedly engaged in improper conduct that has substantially interfered with and shall continue to affect Chicago Title's rights as set forth in the non-competition agreement.  Permanent injunctive relief is both necessary and appropriate to prevent the recurrence of such conduct.  Accordingly, having again considered the relevant factors, the Court concludes that the covenant restraining Magnuson from competing with Chicago Title upon termination of his employment is reasonable because it is no greater than is required for the protection of Chicago Title, does not impose undue hardship on Magnuson (or First American), and is not injurious to the public.  The Court therefore **GRANTS** Chicago Title's motion for injunctive relief and imposes the following modified prohibitions set forth below.

Magnuson is not permitted to participate in, aid, or assist First American's central Ohio activities.  This includes the effect of his presence upon others.  The Court hereby enjoins Magnuson from violating his non-competition agreement, from the date of this injunction through December 31, 2006, by any conduct including but not limited to the following specific prohibitions:

(1)  Maintaining an office in the Ohio Counties of Franklin, Union, Madison, Delaware, Licking, Fairfield and Pickaway (constituting "central Ohio") that is in the same building or building complex as an office of First American or any subsidiary of First American (hereinafter "First American"), as well as any entity in which First American has an ownership interest and/or from which First American derives revenue related to the sale or provision of title insurance or related services;[16]

---

[16]  This prohibition is not, as Defendants suggest, merely designed to assist Magnuson in avoiding temptation.  Rather, the Court recognizes that Magnuson's presence at First American's central Ohio office(s) would send an apparent message to customers that Magnuson is involved in this market.  Absent this prohibition, Magnuson would be assisting First American not

(2) Maintaining in his office a telephone line that is the same number as (or is in any way connected to the telephone system of) any central Ohio office of First American;

(3) Attending and/or participating in any business meeting or social function (including meals) with–or communicating with–any current or potential employee, customer, business referrer, or service provider of First American to the extent that the discussions held at or purpose of the foregoing relate, directly or indirectly, in whole or in part, to the central Ohio title insurance business;[17]

(4) Remaining at any meeting or continuing to participate in any communication that begins to refer or relate directly or indirectly, in whole or in part, to the central Ohio title insurance business; and

(5) Using his name, or allowing his name to be used, in any business marketing materials related to the central Ohio title insurance industry and/or directed to the customers or referrers of the central Ohio title insurance business.

The Court also hereby enjoins First American from engaging in any conduct that would induce Magnuson to breach his non-competition agreement, from the date of this injunction through December 31, 2006, including but not limited to the following specific prohibitions:

(1) Encouraging or allowing Magnuson to violate any of the provisions of the injunction against Magnuson, set forth above;

(2) Referring directly or indirectly to Magnuson while recruiting employees to work in

---

through express actions, but through the implicit message he would be sending to customers and others.

[17] The Court regards Chicago Title's requested "meal or other social function" prohibition as too broad in that it sweeps in innocent activities and purposes that fall outside the scope of the contractual restrictions upon Magnuson. Given the testimony on "meals" presented at trial, the Court understands Chicago Title's attempt at curbing business meetings disguised as mere social outings, but the Court nonetheless declines to impose any overly broad and hopefully unnecessary prohibition.

central Ohio;

(3)  Referring directly or indirectly to Magnuson while attempting to acquire title insurance business in central Ohio; and

(4) Offering or providing Magnuson any compensation of any kind based directly or indirectly on revenues or profits of any of First American's central Ohio operations.

The violation of either injunction risks the imposition of contempt sanctions.

**B.  Motion for Determination and Entry of Award of Attorneys' Fees and Costs (Doc. # 198)**

In the last motion before the Court, Chicago Title moves for entry of an award of attorneys' fees in the amount of $1,553,942.09 and costs in the amount of $283,767.20. Previously, the jury determined that Chicago Title was entitled to attorneys' fees.[18]

First American opposes the motion on a variety of grounds.  The company argues that the requested fees are excessive, warranting substantial reduction.  It asserts that Chicago Title has billed for duplicative and unnecessary work, often  involving voluntarily dismissed claims, and that the company has failed to substantiate billing rates for counsel.  Finally, while contending that Chicago Title is not entitled to any litigation-related, First American also alternatively attacks the requested costs as including extravagant expenses.

At the outset, the Court must note that, given the skill with which counsel for both sides tried this case, the state of the parties' briefing on the fee application is surprisingly flawed. There are thus a number of issues surrounding the fee application that compel this Court to order new briefing prior to conducting the oral hearing on the fee award.  The Court shall begin,

---

[18]  Under Ohio law, an award of attorney's fees must be predicated on statutory authorization or upon a finding of conduct that amounts to bad faith.  *Vance v. Roedersheimer*, 64 Ohio St. 3d 552, 556, 597 N.E.2d 153, 156 (1992).

however, by first addressing those issues that it can resolve based on the briefing and evidence submitted.

The Court first recognizes that First American has failed to rebut the presumption that Chicago Title is entitled to an award of its legal expenses. The punitive damages award involved here is alone not sufficient to compensate fully Chicago Title for its legal fees while fulfilling the appropriate punitive and deterrent purposes inherent to such awards. *Digital & Analog Design Corp. v. North Supply Co.*, 63 Ohio St. 3d 657, 664-65, 590 N.E.2d 737, 743 (1992), *overruled on other grounds*, *Zoppo v. Homestead Ins. Co.*, 71 Ohio St. 3d 552, 644 N.E.2d 397 (1994). But having reached this conclusion, the Court does not serve as a rubber stamp of the requested fees and costs. Chicago Title has the burden of proving that the requested monies are reasonable. *Reed v. Rhodes*, 179 F.3d 453, 472 (6th Cir. 1999). A reasonable fee is one that attracts competent counsel while avoiding a windfall to counsel. *Id*. at 472.

Ohio law provides that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Bittner v. Tri-County Toyota, Inc*., 58 Ohio St. 3d 143, 145, 569 N.E.2d 464, 466 (1991) (quoting *Hensley*, 461 U.S. at 433). This approach, designated the lodestar method, "provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Id.* There is a "strong presumption that the lodestar represents the reasonable fee." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).

But the lodestar calculation does not end the inquiry. Rather, under Ohio law a trial court may "modify that calculation by application of the factors listed in DR 2-106(B)" if the Court finds an adjustment to be necessary under the circumstances of a particular case. *Bittner*, 58 Ohio St. 3d at 145, 569 N.E.2d at 467. *See also Village of Byesville v. Northshore Coal, Inc.*, No. 03CA03, 2003 WL 21787502, at *4 (Ohio App. 5th Dist. Aug. 1, 2003) ("After calculating

[the] starting figure, or 'lodestar,' the court may then modify the amount upward or downward by application of the various factors listed in DR 2-106(B)").  Those factors include:[19]

> the time and labor involved in maintaining the litigation; the novelty and difficulty of the questions involved; the professional skill required to perform the necessary legal services; the attorney's inability to accept other cases; the fee customarily charged; the amount involved and the results obtained; any necessary time limitations; the nature and length of the attorney/client relationship; the experience, reputation, and ability of the attorney; and whether the fee is fixed or contingent.

*Id.* at 145-46, 569 N.E.2d at 467.  Ohio law also provides that "[a]ll [of these] factors may not be applicable in all cases and the trial court has the discretion to determine which factors to apply, and in what manner that application will affect the initial calculation."  *Id.* at 146, 569 N.E.2d at 467.

Further, as noted, not all of the monies sought constitute traditional attorneys' fees (*i.e.*, fees paid directly to counsel for legal services).[20]  The parties dispute whether many of the cited litigation-related expenses–ranging from expert witness fees, transcript costs, computer research fees, lodging, meals, taxies, parking, among other items–are recoverable as attorneys' fees under Ohio common law.  First American cites a number of cases based on fee-shifting statutes to support its argument that such expenses or costs fall outside attorneys' fees.  Chicago Title in

---

[19] The Sixth Circuit has adopted an analogous twelve-factor test for determining the reasonableness of an application for attorney's fees.  *Reed,* 179 F.3d at 471-72 n.3 (adopting factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).  The Ohio Supreme Court has held that the *Bittner* factors apply when determining the reasonableness of an attorney-fee award.  *Judicial Campaign Complaint Against Per Due*, 98 Ohio St. 3d 1548, 787 N.E.2d 10 (2003); *Galmish v. Cicchini*, 90 Ohio St. 3d 22, 36, 734 N.E.2d 782, 795 (2000); *Christe v. GMS Mgt. Co., Inc.*, 88 Ohio St. 3d 376, 378, 726 N.E.2d 497, 499 (2000).

[20] The Sixth Circuit has noted that "the law generally recognizes a difference between the terms 'costs' and 'attorney fees.' " *Rogers v. Wal-Mart Stores, Inc.*, 230 F.3d 868, 874 (6th Cir. 2000) (discussing award of "costs" under Fed. R. Civ. P. 41(d)).  Federal Rule of Civil Procedure 54(d) separates costs from attorneys' fees and other non-taxable expenses.

turn directs this Court to various Ohio cases that, with scant analysis, have included litigation expenses in attorneys' fee awards. The Court's own research has revealed that the issue appears to be little discussed in Ohio case law. Certainly, the cases cited by Chicago Title provide anecdotal support that Ohio courts have awarded such expenses, but they appear to have done so without much journalized analysis. Other Ohio cases not cited by Chicago Title follow suit. *See, e.g., B-Right Trucking Co. v. Interstate Plaza Consulting*, 154 Ohio App. 3d 545, 798 N.E.2d 29 (Ohio App. 7th Dist. 2003) (noting that attorneys' fee award included $4,935.78 in expenses incurred by a law firm, but declining to review amount because it went unchallenged on appeal).

But even if some if not all of the costs in this case do not fall within the scope of attorneys' fees, Chicago Title could still recover various costs as a result of prevailing in the federal system. This is because litigation expenses falling outside the purview of attorneys' fees fall within federal rules governing what litigation costs are and are not recoverable. *Cf. American Trim, L.L.C. v. Oracle Corp.*, 230 F. Supp. 2d 803 (N.D. Ohio 2002) (diversity case in which court applied federal costs statute). The Sixth Circuit has explained that "costs incurred by a party to be paid to a third party, not the attorney for the case, ... cannot reasonably be considered to be attorney's fees. These include, among others, docket fees, investigation expenses, deposition expenses, witness expenses, and the costs of charts and maps." *Sigley v. Kuhn*, 205 F.3d 1341, 2000 WL 145187, at *9 (6th Cir. 2000) (unpublished table decision). Such costs are often recoverable, however, pursuant to 28 U.S.C. § 1920. *Id.*

Amazingly, neither party addresses the potential role the federal rules could have in this case. The Court recognizes here that Chicago Title prevailed in this litigation and is entitled to recover its allowable costs. The extant question is whether it can recover the various amounts it seeks. *Tinch*, 199 F. Supp. 2d at 767. Inherent within that question is the threshold issue of what

54

costs are permitted.  Section 1920 enumerates the types of costs that can be assessed against the

losing party.  *Baker v. First Tenn. Bank Nat'l Ass'n*, 142 F.3d 431, 1998 WL 136560, at *1 (6th

Cir. 1998) (unpublished table decision).  In *Crawford Fitting Company v. J.T. Gibbons, Inc*., 482

U.S. 437 (1987), the Supreme Court held that § 1920 "now embodies Congress' considered

choice as to the kinds of expenses that a federal court may tax as costs against the losing party."

*Id.* at 440; *see also Tinch,* F. Supp. 2d at 768.  Section 1920 defines the term "costs" as used in

Fed. R. Civ. P. 54(d).[21]  *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924

F.2d 633, 643 (7th Cir. 1991).  The statute provides:

> A judge or clerk of any court of the United States may tax as costs the following:
>
> (1) Fees of the clerk and marshal;
> (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.  The Sixth Circuit has explained:

> Other costs are on a different footing [than those that qualify as attorney's fees]. These include those costs incurred by a party to be paid to a third party, not the attorney for the case, which cannot reasonably be considered to be attorney's fees. These include, among others, docket fees, investigation expenses, deposition expenses, witness expenses, and the costs of charts and maps. Most of these expenses have long been recoverable, in the court's discretion as costs, pursuant

---

[21]  Rule 54(d)(1) of the Federal Rules of Civil Procedure provides that costs "shall be allowed as of course to the prevailing party."  The rule's plain language creates a presumption that fees will be awarded, but "allows denial of costs at the discretion of the trial court." *White & White, Inc. v. American Hosp. Supply Corp*., 786 F.2d 728, 730 (6th Cir. 1986).  The Court holds that contrary to First American's argument as to the law, Chicago Title can recover its necessary costs in this case.  In discussing what constitutes necessary costs, Court need not and does not discuss proper components of the costs submitted, such as transcript costs, or costs not specifically challenged by First American.

to 28 U.S.C. § 1920 . . . .

*Northcross v. Board of Educ. of Memphis City Schs.*, 611 F.2d 624, 639 (6th Cir. 1979).

Guided by the foregoing analytic framework, the Court should first calculate the lodestar amount. Although the Supreme Court has recognized that oftentimes the *Bittner/Johnson* factors "are usually subsumed with the initial calculation of hours reasonably expended at a reasonable hourly rate," the Court should then address the *Bittner* factors after the lodestar analysis. *Hensley*, 461 U.S. at 503 n.3. Finally, after determining what components of the expenses sought, if any, constitute attorneys' fees, the Court should then determine whether any remaining expenses not recoverable as attorneys' fees constitute recoverable costs. Unfortunately, the parties' briefing and approach to the fee award issue prevents this Court from undertaking such analysis at this juncture.

Chicago Title utilized two lead attorneys, Steven Goldfarb and Andrew Pollis, in prosecuting this litigation. The fixed rates these attorneys charged ranged from $315 to $385 per hour, with yearly increases in each attorney's billing rate. Additional counsel billed services, and paralegals and other staff assisted in the litigation at lower rates (generally between $65 to $175 per hour depending upon the classification of worker, with a case clerk billed rates of $35 to $100 per hour). First American disputes the reasonableness of such rates, citing both attorneys' out-of-town status and other factors (*e.g.*, attorney Pollis' notable increase in his hourly rate), but Chicago Title's affidavit evidence arguably indicates that the hourly rates charged were indeed reasonable. Chicago Title has directed this Court to compelling Ohio precedent supporting the contention that Cleveland rates can apply to a case tried in the Southern District of Ohio. (Doc. # 223, at 5-6.) The company also argues that the practice of law has developed so that "[i]t is simply naive in this day and age to suggest that statewide law firms ...

or national law firms ... are subject to artificial geographical restraints of practice, or that forum selection should guide the reasonableness of attorneys' fees incurred by a national company in fiercely contested litigation with its biggest competitor."  (Doc # 223, at 6.)

This Court generally agrees with both conclusions.  Ohio law favors a fact-specific inquiry rather than blanket application of the locality rule, and that rule must bow to the individual facts of each case as warranted.  In this case, there are competing affidavits from each side's fees experts as to whether the rates charged by Chicago Title's counsel, most of whom are from Cleveland, are in accordance with prevailing Columbus rates.[22]  The hourly rates of Chicago Title's counsel could fall within the scope of standard hourly rates for counsel of commensurate ability, experience, and talent within the Columbus market.  This Court's experience with hourly rates in other cases would support that conclusion.  Thus, the locality rule debate is potentially inapplicable if the "Cleveland" rates asserted here fall within "Columbus" rates.  The parties should more fully develop this issue.

Having reached these conclusions, the Court now turns to the problematic areas of the fee application.  Complicating the Court's review of the hourly rates billed for professional services is the lack of context inherent in portions of the fee application.  For example, the billing statements submitted include work performed by individuals such as Kelly L. Jeric, who is identified simply as "Case Clerk."  But neither the statements nor the related affidavits explain what a "case clerk" is.  Absent such context, the Court can hardly ascertain whether the hourly

---

[22]  First American's trial counsel assert that attorney Charles R. Saxbe, Chicago Title's fees expert, cannot serve as an expert here because he, through his law firm, has a financial interest in Chicago Title.  By affidavit, Saxbe denies any such interest.  (Doc. # 223, Ex. A, Saxbe Aff.)  An additional affidavit from another partner in Saxbe's firm also denies the assertion and indicates that only some attorneys at the firm, but not Saxbe, write title insurance for an agent of Chicago Title.  (Doc. # 223, Ex. B., Kingston Aff.)  The Court finds that any inference of bias has been rebutted.

rate charge for this individual's services is reasonable.  Ohio law demands greater specificity affording more substantive and substantial review.  *B-Right Trucking Co.*, 154 Ohio App. 3d at 565, 798 N.E.2d at 44 (declining to award fees for "legal assistants" when "[t]he record ... does not divulge that these persons are lawyers or even paraprofessionals, and this is a claim for attorneys fees.  From our review of the record, legal assistant could mean secretary. ... The fees for secretarial staff are typically considered a cost of doing business and are implicit in the hourly rate charged by an attorney.").

The hours billed also present an issue.  The number of hours expended on this case–no doubt by both sides–is simply unfortunate.  The notable volume of paperwork that the parties have generated generally reflects the complexity of the issues involved.  The obese docket also often reflects the substantial apparent ill-will between the parties–feelings that arguably informed the vigorous and at times venomous interaction between opposing counsel, resulting in many hours billed by both sides over disputes of at best modest import.  Reviewing the hours billed and the nature of the work attributed to those hours, the Court is concerned with the issue of duplicative work.

The Sixth Circuit has recognized that one issue that arises regarding the reasonableness of hours billed is "whether the lawyer . . . unnecessarily duplicat[ed] the work of co-counsel." *Coulter v. State of Tennessee*, 805 F.2d. 146, 151 (6th Cir. 1986).  The appellate court has held that a district court has the discretion to make a simple across-the-board reduction, by a certain percentage, in order to account for duplicative hours.  *Hudson v. Reno*, 130 F.3d 1193, 1209 (6th Cir. 1997) (applying across-the-board reduction of 25%), *overruled on other grounds*, *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001).

It appears to the Court that there was indeed some potential duplication in this case. Counsel for Chicago Title have voluntarily applied substantial pre-bill adjustments, including

voluntary "write-down" and courtesy discounts of considerable value, to Chicago Title for many services.  This partially offsets duplicative work and billing, as well as work performed by less-experienced counsel for what Chicago Title's counsel describes as training purposes.  Nevertheless, the billing statements and the Court's own observations indicate that a notable number of counsel and staff worked on–and are included in the billing for–this case.

The Court finds the number of attorneys involved to be excessive given the ability of Chicago Title's lead counsel, attorneys Goldfarb and Pollis, and because of the moderate level of difficulty involved in presenting even the complex issues at trial.  The Court observed at least three and sometimes four to five attorneys in the courtroom on behalf of Chicago Title during trial.  Staff assistants provided additional support.  However, only two attorneys–counsel Goldfarb and Pollis–actively participated as trial counsel; a third attorney, an associate, engaged primarily in technical support (that counsel utilized as an effective and important component of presenting their case) and at times provided lead counsel with background research subsequently used in arguing before the Court.  The Court is concerned that the associate billed an hourly rate as an attorney for technical support more properly performed by a paralegal or other assistant (or at least billed as such).  Additionally, the presence of staff assistants and other counsel, without more detailed discussion of their roles, presents some apparent duplication potentially warranting fee reduction.  *See Tinch v. City of Dayton*, 199 F. Supp. 2d 758, 764 (S.D. Ohio 2002) (reducing an attorney's fee award because "[i]t appears from the documentation supplied by the Plaintiffs, as well as from the Court's observation of the trial (*i.e.*, three people attending the trial every day with only [one] actively participating), that their counsel and paralegal engaged in duplication of effort."). Given the above factors, the Court recognizes that a reduction in the overall fee award may indeed be warranted for duplicative efforts.

The Court also recognizes that this case required both sides to spend a substantial amount

of time and energy in order to litigate fully the issues presented.  It further appears to the Court

that this case prevented counsel from both sides from accepting other work, at least during the

pendency of the multi-week trial.

The Court has considered the amount involved and the results obtained.  Indeed,

according to *Hensley*, the single most important factor regarding the reasonableness of fees is the

result that is obtained.  *Id.*, 461 U.S. at 434-36.  Chicago Title prevailed on both the claims it

took to trial, resulting in a compensatory damages award by the jury of $10,800,000 and a

punitive damages award of $32,400,000.[23]  Chicago Title seeks a combined total of

$1,837,709.29 in fees and expenses.

Under *Hensley*, if counsel obtained excellent results, the Court should award the full fee

request.  *Id.* at 435.  In contrast, partial victory cases occur "where plaintiff is deemed prevailing

even though he succeeded on only some of his claims for relief."  *Id*. at 439.  In partial victory

situations, the Court may reduce the fee award.  *Id*.  "A reduced fee award is appropriate if the

relief, however significant, is limited in comparison to the scope of the litigation as a whole."  *Id.*

Stated simply, a party who partially prevails is entitled to an award of attorneys' fees

commensurate to that party's success.  *Krichinsky v. Knox County Sch*., 963 F.2d 847, 850 (6th

Cir. 1992).

Here, Chicago Title prevailed on all the claims it took to trial, while dismissing or

settling other claims prior to trial.  But as explained above, some of the dismissed claims

---

[23]  Citing an 1859 Ohio case of questionable relevance, First American argues that a jury
could include attorneys' fees as part of its compensatory damages award.  (Doc. # 212, at 17.)
That does not hold true for the jury in this case, given that the Court specifically instructed the
jury (1) as to the meaning of "compensatory damages," which did not include attorneys' fees or
costs (Jury Instructions at 32); (2) to address the award of attorneys' fees *only* following a
determination of punitive damages (Jury Instructions at 24, 28, 36), and (3) that *only* the Court
would determine the amount of attorneys' fees (Jury Instructions at 36).

informed the claims pursued at trial.  These claims  involved "a common core of facts ... based on related legal theories." *Hensley*, 461 U.S. at 435.  The Supreme Court has explained that where a plaintiff's work on one, unsuccessful claim is so closely intertwined with work on another, successful claim, a court should not require plaintiff's counsel to "divide the hours expended on a claim-by-claim basis." *Id.  See also Bittner,* 58 Ohio St. 3d at 145, 569 N.E.2d at 466.  Although Chicago Title did not lose on its dismissed claims, that direction from the Supreme Court speaks to the analogous situation found here.  Further, the Court's review of the submitted statements reveals that Chicago Title's counsel did subtract hours that were solely attributable to claims and issues not taken to trial (*e.g.*, the copyright issues and the Wiese claim).  First American agrees with this last fact (Doc. # 212, at 12), but argues that the vague representations of Chicago Title in this regard warrant further discounting of this time.

As the party seeking fees, Chicago Title bears the burden of "documenting the number of hours spent on the case and of maintaining records in a way that would allow a court to determine how much time was spent on each claim." *Moore*, 355 F.3d at 566.  In discussing the amount of detail necessary in documentation submitted to a court, the Sixth Circuit has held that "the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *United Slate, Tile and Composition Roofers, et al., v. G & M Roofing and Sheet Metal Co., Inc*., 732 F.2d 495, 502 n.2. (6th Cir. 1984).  The Court may reduce the award when the submitted documentation is inadequate. *Reed*, 179 F.3d at  472.

The Court has reviewed the billing entries provided to discern whether they contain sufficient detail, when read in context, to enable the Court to determine that the time was reasonably spent in pursuit of Chicago Title's interests.  In conducting such a review, the Court

has been mindful that although many of the entries do not state in much detail the substance of all conferences, meetings, or discussions, such detail would likely be protected by the work product doctrine or the attorney-client privilege. Thus, the Court has endeavored to balance careful scrutiny of the billing statements with the right of Chicago Title and counsel to avoid disclosure of matters that are not the Court's business.

The billing statements submitted to the Court are voluminous, at times detailed and clear and at times spartan. The Court is neither in the business of nor interested in second-guessing or micro-managing any firm's business practices. In addressing the fee application's supporting materials, however, the Court cannot always discern with a fair degree of certainty the purpose or scope of each item billed. Numerous time entries simply contain insufficient detail to make clear their need or reasonableness. The Court has no reason whatsoever to doubt that the work billed was actually expended in the prosecution of the litigation. But the Court has some limited difficulty in ascertaining the reasonableness of each hour billed.

Such a conclusion would warrant an across-the-board reduction in fees, because no counsel should benefit from any lack of detail, however inadvertent or unavoidable. In contemplating such an adjustment, the Court again notes that it does not doubt that counsel worked the hours indicated or that counsel have made a good faith attempt to disclose their efforts in sufficient detail. The Court also notes that it would proceed to schedule the fees hearing with the thought that, based on the briefing and evidence submitted, Chicago Title has generally met its burden of demonstrating reasonableness if the Court partially reduces the overall fees billed.[24] But the lack of briefing on the standards to be applied to determining what

---

[24] So that no party will assign an overly narrow interpretation to this Order, the Court emphasizes that it considers the written submission but one aspect of the fee application, with the oral hearing constituting the second aspect of the application. Thus, by submitting at times vague bills, Chicago Title has not failed to carry its burden so as to preclude the fees requested.

constitutes attorneys' fees and what constitutes costs recoverable under Rule 54(d) and § 1920 persuades this Court that conducting a hearing without the benefit to the Court and to the parties of additional attention to these issues would serve only to complicate a task that should not be unnecessarily complicated.

The Court therefore **ORDERS** that the parties shall submit supplemental briefing in accordance with the schedule set forth below. Said briefing should include attention to the already discussed areas, such as the basis for determining attorneys' fees under Ohio law and related litigation expenses, the potential applicability of federal rules, and clarification of the submitted materials, in addition to addressing the areas set forth below and any other relevant issue. The briefing may also include fees related to time spent on post-trial briefing and the fee application. *See Coulter*, 805 F.2d at 151. For ease of reference, the supplemental briefing shall constitute the fee application and should include a second or renewed motion for fees because the Court shall designate the current motion for fees as **DENIED WITHOUT PREJUDICE**. The parties may if they wish incorporate by reference the prior evidentiary materials, but if new material is submitted, the Court would appreciate if all evidentiary materials are submitted in one filing.

To aid both sides in their briefing, the Court mentions here several specific components of the fee application that upon first review could warrant reduction. The Court recognizes that First American has not contested several of these components directly, but finds that no prejudice attaches to Chicago Title by mention of these components here because Chicago Title can also address these issues (and mention of other components aids Chicago Title in

Rather, the Court recognizes here only that based on the current materials submitted, Chicago Title would incur an across-the-board reduction that it can potentially evade through the submission of more sufficient billing and/or evidence presented at the hearing.

anticipating the Court's concerns at the oral hearing).

First American attacks that portion of the bills that account for transportation costs of Chicago Title's counsel, as well as, ironically for First American, some but not all of the meal costs. Although counsel are certainly entitled to transportation and food, they should endeavor to limit such expenditures to reasonable costs. The parties have adopted an all-or-nothing approach to these expenditures, claiming either a right to full compensation or that no compensation should be awarded. Assuming *arguendo* that these costs are recoverable either as attorneys' fees or costs, either party may want to discuss voluntary reductions or fair methods of determining reasonable recovery rates. For example–*without* opining on the reasonableness of the issue but using an expenditure *simply for illustrative purposes*–the Court notes that a per-mile reimbursement might be suggested to take the place of a $300 per trip transportation fee.

This same principle might be applied to the cost of meals listed on the billing statement.

The parties may also desire to explore more fully the issue of jury consultant fees. To the extent that this cost could be considered a non-taxable expense related to the attorneys' fees under Fed. R. Civ. P. 54(d)(2) and/or contemplated under state common law, the wholly vague description of the services rendered would without additional information preclude this Court from concluding that the expense is necessary or reasonable. The issue necessitates attention, *see Jorling v. Habilitation Services, Inc.*, No. 103CV00073-WO, 2005 WL 165760, at *12 (S.D. Ohio July 14, 2005) (declining to award jury consultant fee), as does the issue of what expenses constituting the remaining cost of the mock trial may be recoverable. *See Sigley*, 205 F.3d 1341, 2000 WL 145187, at *9 (affirming expense as cost under § 1920 where "the costs of obtaining jurors and paying expenses for a mock trial were reasonably determined by the trial court to be recoverable on the theory that the mock trial conferred a benefit to the prevailing party by helping to produce a favorable result").

First American also argues that computer-aided research cannot be billed as costs but are subsumed in attorneys' fees.  The application for expenses and costs is vague as it relates to computer research.   Countless entries appear in the fee application that are described only as research by designating the electronic service provider used; these entries do not list what was researched (although comparison of the work done that day often yields a reasonable conclusion as to the general topic researched).

In *Black v. Lojac Enterprises, Inc*., 117 F.3d 1420, 1997 WL 377051 (6th Cir. 1997) (unpublished table decision), the Sixth Circuit addressed a case in which the trial court had subtracted time from a plaintiff's request because the submitted time entries were vague.  *Id.* at *2.  The appellate court affirmed the district court's decision, stating that "many of the time entries failed to even identify the general subject matter involved, documented with such vague descriptions as 'research,' 'pick-up,' 'revised form,' and 'office conference.' . . .  Thus, such entries clearly provide little guidance in ascertaining the purpose of the work during the time claimed and do not merit an award." *Id.* at *3.  Pursuant to *Black* and in light of the fact that the computer-research records submitted by Chicago Title are vague, the Court recognizes that the issue may warrant further attention.

Additionally, the fee application as currently constituted fails to establish the rates charged for such things as document copies, telephone calls, and  faxes.  There is also no discussion in the submitted materials of the need for a daily transcript of the trial.  Thus, although recognizing that a daily transcript is helpful, the Court notes that Chicago Title must prove that the cost of the daily trial transcripts it received were necessary and thus taxable under § 1920(2) unless otherwise permitted under state common law.  *U.S. ex rel. Pickens v. GLR Constructors, Inc.*, 196 F.R.D. 69, 75 (S.D. Ohio 2000) (quoting *White*, 786 F.2d at 730).  It also does not appear that the company's submissions reflect the expense of a transcript at the court

reporter's regular rate–a necessary expense for post-trial motions that is recoverable under federal rules.

Finally, to resolve a clear issue now, the Court notes that First American also argues that, at best, Chicago Title should only be able to recover on its tort claim. Thus, the company reasons, the Court should reduce any fees awarded by a third. First American also notes twelve various billing components for issues that Chicago Title never pursued, abandoned, or dismissed, as well pointing to work completed on motions often drafted but ultimately abandoned for a variety of reasons. (Doc. # 212, at 11-12.) First American's request for reducing the fees is predicated upon its erroneous, narrow construction of the claims and decisions involved in this case. The Court again rejects the application of the company's self-serving theory.

The Court **DENIES WITHOUT PREJUDICE** the motion for fees and **ORDERS** that the parties adhere to the following schedule:

(1) Chicago Title shall submit a second or renewed motion for fees and costs with a supporting memorandum of law and any additional evidentiary materials by October 14, 2005;

(2) First American shall file a memorandum in opposition and any additional evidentiary materials by October 28, 2005;

(3) Chicago Title shall file a reply memorandum and any additional evidentiary materials by November 4, 2005;

(4) The Court schedules a hearing on the fee application on November 15, 2005, beginning at 9:00 a.m., in Courtroom 4, at which time the parties may present additional evidence or simply rely upon the evidence submitted with their briefing.

## IV. Conclusion

For the foregoing reasons, the Court **DENIES** Defendants' motions for judgment as a

matter of law or for a new trial (Docs. # 192, 193, 194), **GRANTS** Chicago Title's motion for

entry of injunctive relief (Doc. # 196), **ENTERS** the injunctions set forth above, and **DENIES**

**WITHOUT PREJUDICE** Chicago Title's motion for a determination and award of attorney's

fees and costs (Doc. # 198).  The Court further **ORDERS** that the parties shall adhere to the

briefing schedule set forth above so that the Court may address the issues surrounding Chicago

Title's application for fees at the scheduled hearing without needing post-hearing briefing.

      **IT IS SO ORDERED.**

                                    /s/   Gregory L. Frost
                                  GREGORY L. FROST
                                  UNITED STATES DISTRICT JUDGE